[S.F. No. 23241. In Bank. Sept. 16, 1975.]

JOHN F. SKELLY, Plaintiff and Appellant, v.
STATE PERSONNEL BOARD et al., Defendants and Respondents.

**COUNSEL**

Loren E. McMaster and Allen R. Link for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, and Joel S. Primes, Deputy Attorney General, for Defendant and Respondent.

## OPINION

**SULLIVAN, J.**—Plaintiff John F. Skelly, M.D. (hereafter petitioner) appeals from a judgment denying his petition for writ of mandate to compel defendants State Personnel Board (Board) and its members to set aside his allegedly wrongful dismissal from employment by the State Department of Health Care Services (Department).[1] In challenging his removal, petitioner asserts, among other things, that California's statutory scheme regulating the taking of punitive action against permanent civil service employees violates the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution and article I, sections 7 and 15, of the California Constitution.

In July 1972 petitioner was employed by the Department as a medical consultant.[2] He held that position for about seven years and was a permanent civil service employee of the state. (See Gov. Code, § 18528.)[3] About that time the Department, through its personnel officer Wade Williams, gave petitioner written notice that he was terminated from his position as medical consultant, effective 5 p.m., July 11, 1972. The notice specified three causes for the dismissal: (1) Intemperance, (2) inexcusable absence without leave, and (3) other failure of good behavior during duty hours which caused discredit to the Department.[4] It further described petitioner's alleged acts and omissions which formed the basis of these charges, and notified him that to secure a hearing in the matter, he would be required to file a written answer with the Board within 20 days, and that in the event of his failure to do so, the punitive action

---

[1] Petitioner also named as defendants the Department and its director.

[2] Petitioner graduated from George Washington University Medical School, Washington, D.C. in 1934. He was licensed to practice medicine in California the same year and, after a three-year residency, entered private practice in 1937, specializing in ear, nose and throat problems. During 13 of his 28 years in private practice, he taught at the University of California Medical Center. Cataract surgery and resulting nerve degeneration in his eyes forced petitioner to cease private practice in 1965. He commenced employment as a medical consultant with the State Welfare Department, which became part of the State Department of Health Care Services in 1969.

[3] Government Code section 18528 provides: " 'Permanent employee' means an employee who has permanent status. 'Permanent status' means the status of an employee who is lawfully retained in his position after the completion of the probationary period provided in this part and by board rule." The "probationary period" is the initial period of employment and generally lasts for six months unless the Board establishes a longer period not exceeding one year. (Gov. Code, § 19170.)

Hereafter, unless otherwise indicated, all section references are to the Government Code.

[4] Each of these causes provides a basis for punitive action against a permanent civil service employee under section 19572, subdivisions (h), (j), and (t).

would be final. On July 12, 1972, petitioner filed an answer, and on September 15, 1972, a hearing was held before an authorized representative of the Board.

At the hearing, the Department introduced the testimony of Philip L. Philippe, Gerald R. Green and Bernard V. Moore, three successive district administrators of the Department's Sacramento office to which petitioner had been assigned. Their testimony was corroborated in part by written documents from the Department files, and disclosed the following facts: Philippe met with petitioner on November 17, 1970, to discuss the latter's unexcused absences, apparent drinking on the job and failure to comply with Department work hour requirements. This meeting was held at the insistence of several staff members who had complained to Philippe about petitioner's conduct. The doctor was admonished to comply with pertinent Department rules and regulations.

Nevertheless, despite further warnings given petitioner and efforts made to accommodate him by extending his lunch break from the usual 45 minutes to one hour, he persisted in his unexplained absences and failure to observe work hours and as a result on February 28, 1972, received a letter of reprimand and a one-day suspension.

This punitive action had little effect on petitioner who continued to take excessive lunch periods. On March 3, 1972, Gerald Green, then district administrator, and Doris Soderberg, regional administrator, met with petitioner and discussed his refusal to obey work rules, but apparently to no avail. He took lengthy lunch breaks on March 13, 14, 15 and 16. Green again met with petitioner on March 16 in an effort to resolve the problem. When asked why he had taken 35 extra minutes for lunch that day, petitioner claimed to be sick. Green responded that on the day in question he had observed the doctor drinking and talking at a restaurant and bar. Green then suggested that petitioner, for his own convenience, change from full-time to part-time status at an adjusted compensation. Petitioner declined to do so and Green admonished him that further violations of work rules would result in disciplinary action and even dismissal.

In the early afternoon of June 26, Bernard Moore, who succeeded Green as district administrator, attempted but without success to see petitioner in the latter's office. Moore found him at a local bar laughing and talking, with a drink in front of him, his hair somewhat disheveled, and his arm around a companion. Petitioner later left the bar but did not

return to his office that day. Nor did he notify Moore of his proposed absence as required by Department rules. Subsequently petitioner attempted to have Moore record his absence as "sick leave."

In his defense, petitioner testified that he had in fact been sick on the afternoon of June 26, and that after an unsuccessful attempt to telephone his wife, he had informed a co-worker that he was going home.[5] He then went to a local bar and, after requesting a friend to call his wife, remained at the bar until she picked him up. Petitioner's version of the events was corroborated by his wife, a cocktail waitress, and the friend who had placed the call. Petitioner admitted, however, that despite his illness, he had had two martinis at lunch.

Petitioner further testified that his longer lunch periods involved no more than 5 to 15 extra minutes. In justification of this, he stated that he had more than made up for the time missed by skipping his morning and afternoon coffee breaks, by working more than his allotted time over holidays and by occasionally taking work home with him. He denied having a drinking problem and stated that his alcoholic intake during working hours was limited to an occasional drink or two at lunch.

Three co-workers, including Dr. F. Audley Hale, the senior medical consultant and petitioner's immediate supervisor for 13 months, confirmed petitioner's testimony that he rarely took coffee breaks. They described him as efficient, productive and extremely helpful and cooperative, and stated that his work had never appeared to be affected by alcoholic consumption. Dr. Hale rated petitioner's work as good to superior[6] and assessed him as "our right hand man as far as information concerning ear, nose and throat problems not only for the District Office but for the Region as well." He stated that the Department definitely needed someone with the doctor's skills.

The Department introduced no evidence to show, and indeed did not claim, that the quality or quantity of petitioner's work was in any way inadequate; his failure to comply with the prescribed time schedule did not impede the effective performance of his own duties or those of his fellow workers. Although petitioner was handicapped by relatively serious sight and speech impediments, the Department did not rely upon these physical deficiencies as grounds for dismissal; nor did it appear that these difficulties affected his work performance.

[5]Moore apparently was not available at that particular time.

[6]The reports prepared during petitioner's probationary period similarly rated his work.

On September 19, 1972, the hearing officer submitted to the Board a proposed decision recommending that the punitive action against petitioner be sustained without modification. He made findings of fact in substance as follows: (1) That on February 28, 1972, petitioner suffered a one-day suspension for a four-hour unexcused absence on January 10, 1972, for excessive lunch periods on January 11 and 19, 1972, and for a lengthy afternoon break spent at a bar on February 25, 1972; (2) that despite efforts to accommodate petitioner by extending his lunch break to one hour, he continued to exceed the prescribed period by five to ten minutes for the four days following his suspension and again on March 13, 14 and 15, 1972; (3) that on March 16, 1972, petitioner took 1 hour and 35 minutes for lunch and claimed that this was due to illness when in fact he had been drinking; (4) that on the afternoon of June 26, 1972, the district administrator found petitioner at a bar during work hours, with his hair disheveled, his arm around another patron and a drink in front of him; and (5) that the petitioner's unexcused absence on June 26, 1972, was not due to illness.

The hearing officer found that these facts constituted grounds for punitive action under section 19572, subdivision (j) (inexcusable absence without leave). In considering whether dismissal was the appropriate discipline, the officer noted that "[a]ppellant is 64 years old, has had a long and honorable medical career and is now handicapped by serious sight and speech difficulties. Also, the Senior Medical Consultant has no complaints about appellant's work." On the other hand, he pointed out that the Department's problems with petitioner dated back to 1970, that he had been warned, formally as well as informally, that compliance with Department rules was required, and that he had nevertheless persisted in his pattern of misconduct. On this basis, the hearing officer concluded that there was no reason to anticipate improvement if petitioner were restored to his position and recommended that the Department's punitive action be affirmed. The Board approved and adopted the hearing officer's proposed decision in its entirety and denied a petition for rehearing.[7] These proceedings followed.

Petitioner urges both procedural and substantive grounds for annulling the Board's decision. As to the procedural ground, he contends that the provisions of the State Civil Service Act (Act) governing the taking of punitive action against permanent civil service employees, without

[7]The foregoing administrative actions conformed with the procedure prescribed by sections 19574-19588 for the dismissal of a permanent civil service employee.

requiring a prior hearing, violate due process of law as guaranteed by both the United States Constitution and the California Constitution. As to the substantive grounds, he attacks the Board's decision on two bases: First, he argues that the Board's findings are not supported by substantial evidence; second, he asserts that the Board abused its discretion in approving petitioner's dismissal which, he claims, is unduly harsh and disproportionate to his allegedly wrongful conduct.

## I

Turning first to petitioner's claims of denial of due process, we initially describe the pertinent statutory disciplinary procedure here under attack.

The California system of civil service employment has its roots in the state Constitution. Article XXIV, section 1, subdivision (b), describes the overriding goal of this program of state employment: "In the civil service permanent appointment and promotion shall be made under a general system based on *merit* . . . ."[8] (Italics added.) (See also Assem. Interim Com. Rep., Civil Service and State Personnel (1957-1959) Civil Service and Personnel Management, 1 Appendix to Assem. J. (1959 Reg. Sess.) p. 21.) The use of merit as the guiding principle in the appointment and promotion of civil service employees serves a two-fold purpose. It at once " 'abolish[es] the so-called spoils system, and [at the same time] . . . increase[s] the efficiency of the service by assuring the employees of continuance in office regardless of what party may then be in power. Efficiency is secured by the knowledge on the part of the employee that promotion to higher positions when vacancies occur will be the reward of faithful and honest service' [citation] . . . ." (*Steen* v. *Board of Civil Service Commrs.* (1945) 26 Cal.2d 716, 722 [160 P.2d 816].) The State Personnel Board is the administrative body charged with the enforcement of the Civil Service Act, including the review of punitive action taken against employees.[9]

---

[8]Under the prescribed constitutional scheme, "[t]he civil service includes every officer and employee of the state except as otherwise provided in this Constitution." (Cal. Const., art. XXIV, § 1, subd. (a).) Article XXIV, section 4, lists those categories of officers and employees who are exempt from the civil service.

[9]The composition of the Board is described in article XXIV, section 2, subdivision (a), of the California Constitution as follows: "There is a Personnel Board of 5 members appointed by the Governor and approved by the Senate, a majority of the membership concurring, for 10-year terms and until their successors are appointed and qualified. Appointment to fill a vacancy is for the unexpired portion of the term. A member may be removed by concurrent resolution adopted by each house, two-thirds of the membership of each house concurring."

The Board's duties are set forth in article XXIV, section 3, subdivision (a), as follows: "The Board shall enforce the civil service statutes and, by majority vote of all of its

To help insure that the goals of civil service are not thwarted by those in power, the statutory provisions implementing the constitutional mandate of article XXIV, section 1, invest employees with substantive and procedural protections against punitive actions by their superiors.[10] Under section 19500, "[t]he tenure of every permanent employee holding a position is *during good behavior.* Any such employee may be . . . permanently separated [from the state civil service] through resignation or *removal for cause* . . . or terminated for medical reasons . . . ." (Italics added.) The "causes" which may justify such removal, or a less severe form of punitive action,[11] are statutorily defined. (§ 19572.)

The procedure by which a permanent employee may be dismissed or otherwise disciplined is described in sections 19574 through 19588. Under section 19574,[12] the "appointing power"[13] or its authorized representative may effectively take punitive action against an employee by simply notifying him of the action taken.[14] (*California Sch. Employees Assn.* v. *Personnel Commission* (1970) 3 Cal.3d 139, 144, fn. 2 [89 Cal.Rptr. 620, 474 P.2d 436]; Personnel Transactions Man., March 1972.)

members, shall prescribe probationary periods and classifications, adopt other rules authorized by statute, and review disciplinary actions."

[10]In the instant case, we are concerned only with provisions of the Act insofar as they govern the disciplining of permanent employees (see fn. 3, *ante*) and we limit our discussion accordingly.

[11]Section 19570 provides: "As used in this article, 'punitive action' means dismissal, demotion, suspension, or other disciplinary action." The Board has defined "other disciplinary action" to include, among other things, official reprimand and reduction in salary. (Personnel Transactions Man., March 1972.)

Section 19571 is the provision establishing general authority to take punitive action: "In conformity with this article and board rule, punitive action may be taken against any employee, or person whose name appears on any employment list for any cause for discipline specified in this article."

[12]Section 19574 provides as follows: "The appointing power, or any person authorized by him, may take punitive action against an employee for one or more of the causes for discipline specified in this article by notifying the employee of the action, pending the service upon him of a written notice. Punitive action is valid only if a written notice is served on the employee and filed with the board not later than 15 calendar days after the effective date of the punitive action. The notice shall be served upon the employee either personally or by mail and shall include: (a) a statement of the nature of the punitive action; (b) the effective date of the action; (c) a statement of the causes therefor; (d) a statement in ordinary and concise language of the acts or omissions upon which the causes are based; and (e) a statement advising the employee of his right to answer the notice and the time within which that must be done if the answer is to constitute an appeal."

[13]Under section 18524, " '[a]ppointing power' means a person or group having authority to make appointments to positions in the State civil service."

[14]For the procedure regulating discipline where charges against the employee are filed by a third party with the consent of the Board or the appointing power, see section 19583.5.

No particular form of notice is required. (29 Ops.Cal.Atty.Gen. 115, 120 (1957); Personnel Transactions Man., March 1972.) However, within 15 days *after* the effective date of the action, the appointing power *must* serve upon the employee and file with the Board a written notice specifying: (1) the nature of the punishment, (2) its effective date, (3) the causes therefor, (4) the employee's acts or omissions upon which the charges are based, and (5) the employee's right to appeal. (§ 19574.)[15]

Except in cases involving minor disciplinary matters,[16] the employee has a right to an evidentiary hearing to challenge the action taken against him.[17] To obtain such a hearing, the employee must file with the Board a written answer to the notice of punitive action within 20 days after service thereof.[18] The answer is deemed to constitute a denial of all allegations contained in the notice which are not expressly admitted as well as a request for a hearing or investigation. (§ 19575; see fn. 18, *ante.*) Failure to file an answer within the specified time period results in the punitive action becoming final. (§ 19575.)

[15]See footnote 12, *ante.*

In an opinion issued on March 26, 1953, the Attorney General described the "statement of causes" as follows: "Such statement of causes is not merely a statement of the statutory grounds for punitive action set forth in section 19572 but is a factual statement of the grounds of discipline which, although not necessarily pleaded with all the niceties of a complaint in a civil action or of an information or indictment in a criminal action, should be detailed enough to permit the employee to identify the transaction, to understand the nature of the alleged offense and to obtain and produce the facts in opposition [citations]." (See 21 Ops.Cal.Atty.Gen. 132, 137 (1953).)

[16]Such minor disciplinary matters generally include those cases in which the discipline imposed is suspension without pay for 10 days or less. Section 19576 describes the procedural rights of an employee subjected to this form of discipline.

[17]Section 19578 provides that "[w]henever an answer is filed to a punitive action other than a suspension without pay for 10 days or less, the board or its authorized representative shall within a reasonable time hold a hearing. The board shall notify the parties of the time and place of the hearing. Such hearing shall·be conducted in accordance with the provisions of Section 11513 of the Government Code, except that the employee and other persons may be examined as provided in Section 19580, and the parties may submit all proper and competent evidence against or in support of the causes." .

[18]Section 19575 describes the procedure to be followed by an employee in answering a notice of punitive action: "No later than 20 calendar days after service of the notice of punitive action, the employee may file with the board a written answer to the notice, which answer shall be deemed.to be a denial of all of the allegations of the notice of punitive action not expressly admitted and a request for hearing or investigation as provided in this article. With the consent of the board or its authorized representative an amended answer may subsequently be filed. If the employee fails to answer within the time specified or after answer withdraws his appeal the punitive action taken by the appointing power shall be final. A copy of the employee's answer and of any amended answer shall promptly be given by the board to the appointing power."

In cases where the affected employee files an answer within the prescribed period, the Board, or its authorized representative, must hold a hearing within a reasonable time. (§ 19578; see fn. 17, *ante.*) As a general rule, the case is referred to the Board's hearing officer who conducts a hearing[19] and prepares a proposed decision which may be adopted, modified or rejected by the Board. (§ 19582.) The Board must render its decision within a reasonable time after the hearing. (§ 19583.)[20] If the Board determines that the cause or causes for which the employee was disciplined were insufficient or not sustained by the employee's acts or omissions, or that the employee was justified in engaging in the conduct which formed the basis of the charges against him, it may modify or revoke the punitive action and order the employee reinstated to his position as of the effective date of the action or some later specified date. (§ 19583; see fn. 20, *ante.*) The employee is entitled to the payment of salary for any period of time during which the punitive action was improperly in effect. (§ 19584.)[21]

In the case of an adverse decision by the Board, the employee may petition that body for a rehearing. (§ 19586.)[22] As an alternative or in addition to the rehearing procedure, the employee may seek review of

[19]At such hearing, the appointing power has the burden of proving by a preponderance of the evidence the acts or omissions of the employee upon which the charges are based and of establishing that these acts constitute cause for discipline under the relevant statutes. (§§ 19572, 19573.) The employee may try to avoid the consequences of his actions by showing that he was justified in engaging in the conduct upon which the charges are based. (See 21 Ops.Cal.Atty.Gen. 132, 139 (1953).)

[20]Under the terms of section 19583, "[t]he board shall render a decision within a reasonable time after the hearing or investigation. The punitive action taken by the appointing power shall stand unless modified or revoked by the board. If the board finds that the cause or causes for which the punitive action was imposed were insufficient or not sustained, or that the employee was justified in the course of conduct upon which the causes were based, it may modify or revoke the punitive action and it may order the employee returned to his position either as of the date of the punitive action or as of such later date as it may specify. The decision of the board shall be entered upon the minutes of the board and the official roster."

[21]Section 19584 provides: "Whenever the board revokes or modifies a punitive action and orders that the employee be returned to his position it shall direct the payment of salary to the employee for such period of time as the board finds the punitive action was improperly in effect.

"Salary shall not be authorized or paid for any portion of a period of punitive action that the employee was not ready, able, and willing to perform the duties of his position, whether such punitive action is valid or not or the causes on which it is based state facts sufficient to constitute cause for discipline.

"From any such salary due there shall be deducted compensation that the employee earned, or might reasonably have earned, during any period commencing more than six months after the initial date of the suspension."

[22]Section 19586 provides in pertinent part that "[w]ithin thirty days after receipt of a copy of the decision rendered by the board in a proceeding under this article, the

the Board's action by means of a petition for writ of administrative mandamus filed in the superior court. (§ 19588; *Boren* v. *State Personnel Board* (1951) 37 Cal.2d 634, 637 [234 P.2d 981].)[23]

As previously indicated, petitioner asserts that this statutory procedure for taking punitive action against a permanent civil service employee violates due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and article I, sections 7 and 15 of the California Constitution. His contention is that these provisions authorize a deprivation of property without a *prior* hearing or, for that matter, without any of the *prior* procedural safeguards required by due process before a person may be subjected to such a taking at the hands of the state. As it is clear that California's statutory scheme does provide for an evidentiary hearing after the discipline is imposed (§§ 19578, 19580, 19581), we view the petitioner's constitutional attack as directed against that section which permits the punitive action to take effect without according the employee any prior procedural rights. (§ 19574; see fn. 12, *ante.*)

Our analysis of petitioner's contention proceeds in the light of a recent decision of the United States Supreme Court dealing with a substantially identical issue. In *Arnett* v. *Kennedy* (1974) 416 U.S. 134 [40 L.Ed.2d 15, 94 S.Ct. 1633], the high court was faced with a due process challenge to the provisions of the federal civil service act, entitled the Lloyd-LaFollette Act, regulating the disciplining of nonprobationary government employees. (5 U.S.C. § 7501.) Under that statutory scheme, a nonprobationary employee may be "removed or suspended without pay only for such cause as will promote the efficiency of the service." (5 U.S.C. § 7501 (a).) The same statute granting this substantive right to continued employment absent cause sets forth the procedural rights of an employee prior to discharge or suspension.

employee or the appointing power may apply for a rehearing by filing with the board a written petition therefor. Within thirty days after such filing, the board shall cause notice thereof to be served upon the other parties to the proceedings by mailing to each a copy of the petition for rehearing, in the same manner as prescribed for notice of hearing.

"Within sixty days after service of notice of filing of a petition for rehearing, the board shall either grant or deny the petition in whole or in part. Failure to act upon a petition for rehearing within this sixty-day period is a denial of the petition."

[23]Section 19588 provides: "The right to petition a court for writ of mandate, or to bring or maintain any action or proceeding based on or related to any civil service law of this State or the administration thereof shall not be affected by the failure to apply for rehearing by filing written petition therefor with the board."

The judicial review proceedings are governed by Code of Civil Procedure section 1094.5. (*Boren* v. *State Personnel Board, supra,* at p. 637.)

Pursuant to this statute and the regulations promulgated under it, the employee is entitled to 30 days advance written notice of the proposed action, including a detailed statement of the reasons therefor, the right to examine all materials relied upon to support the charges, the opportunity to respond either orally or in writing or both (with affidavits) before a representative of the employing agency with authority to make or recommend a final decision, and written notice of the agency's decision on or before the effective date of the action. (5 U.S.C. § 7501 (b); 5 C.F.R. § 752.202 (a), (b), (f).) The employee is not entitled to an evidentiary trial-type hearing until the appeal stage of the proceedings. (5 C.F.R. §§ 752.202 (b), 752.203, 771.205, 771.208, 771.210-771.212, 772.305 (c).) The timing of this hearing—*after,* rather than *before* the removal decision becomes effective—constituted the basis for the employee's due process attack upon the disciplinary procedure.

In a six to three decision, the court found the above procedure to be constitutional. However, the court's full decision is embodied in five opinions which reveal varying points of view among the different justices. As we proceed to consider petitioner's contention, we will attempt to identify the general principles which emerge from these opinions as well as from the other recent decisions of the court in the area of procedural due process and which are determinative of the matter before us.

■ We begin our analysis in the instant case by observing that the California statutory scheme regulating civil service employment confers upon an individual who achieves the status of "permanent employee" a property interest in the continuation of his employment which is protected by due process. In *Board of Regents* v. *Roth* (1972) 408 U.S. 564 [33 L.Ed.2d 548, 92 S.Ct. 2701], the United States Supreme Court "made clear that the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money. [Fn. omitted.]" (*Id.,* at pp. 571-572 [33 L.Ed.2d at p. 557].) Rather, "[t]he Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits. These interests—property interests—may take many forms." (*Id.,* at p. 576 [33 L.Ed.2d at p. 560].)

Expanding upon its explanation, the *Roth* court noted: "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitle-

ment to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

"Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." (*Id.,* at p. 577 [33 L.Ed.2d at p. 561].)

■ Thus, when a person has a legally enforceable right to receive a government benefit provided certain facts exist, this right constitutes a property interest protected by due process. (*Goldberg* v. *Kelly* (1970) 397 U.S. 254, 261-262 [25 L.Ed.2d 287, 295-296, 90 S.Ct. 1011]; see *Geneva Towers Tenants Org.* v. *Federated Mortgage Inv.* (9th Cir. 1974) 504 F.2d 483, 495-496 (Hufstedler, J. dissenting).) Applying these principles, the high court has held that a teacher establishing "the existence of rules and understandings, promulgated and fostered by state officials, that . . . justify his legitimate claim of entitlement to continued employment absent 'sufficient cause,' " has a property interest in such continued employment within the purview of the due process clause. (*Perry* v. *Sindermann* (1972) 408 U.S. 593, 602-603 [33 L.Ed.2d 570, 580, 92 S.Ct. 2694]; see also *Board of Regents* v. *Roth, supra,* 408 U.S. at pp. 576-578 [33 L.Ed.2d at pp. 560-562].) And, in *Arnett* v. *Kennedy, supra,* 416 U.S. 134, six members of the court, relying upon the principles set forth in *Roth,* concluded that due process protected the statutory right of a nonprobationary federal civil service employee to continue in his position absent cause justifying his dismissal. (*Id.,* at p. 167 [40 L.Ed.2d at pp. 40-41] (concurring opn., Justice Powell); *id.,* at p. 185 [40 L.Ed.2d at p. 51] (concurring and dissenting opn., Justice White); *id.,* at p. 203 [40 L.Ed.2d at p. 61] (dissenting opn., Justice Douglas); *id.,* at p. 211 [40 L.Ed.2d at p. 66] (dissenting opn., Justice Marshall).)

The California Act endows state employees who attain permanent status with a substantially identical property interest. Such employees may not be dismissed or subjected to other disciplinary measures unless facts exist constituting "cause" for such discipline as defined in sections 19572 and 19573. In the absence of sufficient cause, the permanent employee has a statutory right to continued employment free of these

punitive measures. (§ 19500.) This statutory right constitutes "a legitimate claim of entitlement" to a government benefit within the meaning of *Roth*. Therefore, the state must comply with procedural due process requirements before it may deprive its permanent employee of this property interest by punitive action.

We therefore proceed to determine whether California's statutes governing such punitive action provide the minimum procedural safeguards mandated by the state and federal Constitutions. In the course of our inquiry, we will discuss recent developments in the area of procedural due process which outline a modified approach for dealing with such questions.

Until last year, the line of United States Supreme Court discussions beginning with *Sniadach* v. *Family Finance Corp.* (1969) 395 U.S. 337 [23 L.Ed.2d 349, 89 S.Ct. 1820], and continuing with *Fuentes* v. *Shevin* (1972) 407 U.S. 67 [32 L.Ed.2d 556, 92 S.Ct. 1983], and the line of California decisions following *Sniadach* and *Fuentes* adhered to a rather rigid and mechanical interpretation of the due process clause. Under these decisions, every significant deprivation—permanent or merely temporary—of an interest which qualified as "property" was required under the mandate of due process to be *preceded* by notice and a hearing absent "extraordinary" or "truly unusual" circumstances. (*Fuentes* v. *Shevin,* *supra*, 407 U.S. 67, 82, 88, 90-91 [32 L.Ed.2d 556, 570-571, 574-576]; *Bell* v. *Burson* (1971) 402 U.S. 535, 542·[29 L.Ed.2d 90, 96, 91 S.Ct. 1586]; *Boddie* v. *Connecticut* (1971) 401 U.S. 371, 378-379 [28 L.Ed.2d 113, 119-120, 91 S.Ct. 780]; *Adams* v. *Department of Motor Vehicles* (1974) 11 Cal.3d 146, 155 [113 Cal.Rptr. 145, 520 P.2d 961]; *Brooks* v. *Small Claims Court* (1973) 8 Cal.3d 661, 667-668 [105 Cal.Rptr. 785, 504 P.2d 1249]; *Randone* v. *Appellate Department* (1971) 5 Cal.3d 536, 547 [96 Cal.Rptr. 709, 488 P.2d 13]; *Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 277 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206]; *McCallop* v. *Carberry* (1970) 1 Cal.3d 903, 907 [83 Cal.Rptr. 666, 464 P.2d 122].) These authorities uniformly held that such hearing must meet certain minimum procedural requirements including the right to appear personally before an impartial official, to confront and ·cross-examine adverse witnesses, to present favorable evidence and to be represented by counsel. (*Brooks* v. *Small Claims Court, supra*, 8 Cal.3d at pp. 667-668; *Rios* v. *Cozens* (1972) 7 Cal.3d 792, 798-799 [103 Cal.Rptr. 299, 499 P.2d 979], vacated *sub nom. Dept. Motor Vehicles of California* v. *Rios* (1973) 410 U.S. 425 [35 L.Ed.2d 398, 93 S.Ct. 1019], new dec. *Rios* v. *Cozens* (1973) 9 Cal.3d 454 [107 Cal.Rptr. 784, 509 P.2d 696]; see also *Goldberg* v. *Kelly* (1970) 397 U.S. 254, 267-271 [25 L.Ed.2d 287, 298-301, 90 S.Ct. 1011].)

However, as we noted a short time ago in *Beaudreau* v. *Superior Court* (1975) 14 Cal.3d 448 [121 Cal.Rptr. 585, 535 P.2d 713], more recent decisions of the high court· have regarded the above due process requirements as being somewhat less inflexible and as not necessitating an evidentiary trial-type hearing at the preliminary stage in every situation involving a taking of property. Although it would appear that a majority of the members of the high court adhere to the principle that some form of notice and hearing must precede a final deprivation of property (*North Georgia Finishing, Inc.* v. *Di-Chem, Inc.* (1975) 419 U.S. 601, 606, [42 L.Ed.2d 751, 757, 95 S.Ct. 719]; *Goss* v. *Lopez* (1975) 419 U.S. 565, 579 [42 L.Ed.2d 725, 737-738, 95 S.Ct. 729]; *Mitchell* v. *W. T. Grant Co.* (1974) 416 U.S. 600, 611-612 [40 L.Ed.2d 406, 415-416, 94 S.Ct. 1895]; *Arnett* v. *Kennedy, supra,* 416 U.S. 134, 164 [40 L.Ed.2d 15, 39] (concurring opn., Justice Powell), p. 178 [40 L.Ed.2d pp. 46-47] (concurring and dissenting opn., Justice White), p. 212 [40 L.Ed.2d pp. 66-67] (dissenting opn., Justice Marshall)), nevertheless the court has made clear that "the *timing* and *content* of the notice and *the nature of the hearing* will depend on an appropriate accommodation of the competing interests involved." (*Goss* v. *Lopez, supra,* 419 U.S. 565, 579 [42 L.Ed.2d 725, 737], italics added; see also *Mitchell* v. *W. T. Grant Co., supra,* 416 U.S. at pp. 607-610 [40 L.Ed.2d at pp. 413-415]; *Arnett* v. *Kennedy, supra,* 416 U.S. at pp. 167-171 [40 L.Ed.2d at pp. 40-43] (concurring opn., Justice Powell), p. 188 [40 L.Ed.2d pp. 52-53] (concurring and dissenting opn., Justice White).) In balancing such "competing interests involved" so as to determine whether a particular procedure permitting a taking of property without à *prior* hearing satisfies due process, the high court has taken into account a number of factors. Of significance among them are the following: whether predeprivation safeguards minimize the risk of error in the initial taking decision, whether the surrounding circumstances necessitate quick action, whether the postdeprivation hearing is sufficiently prompt, whether the interim loss incurred by the person affected is substantial, and whether such person will be entitled to adequate compensation in the event the deprivation ·of his property interest proves to have been wrongful. (*Mitchell* v. *W. T. Grant Co., supra,* 416 U.S. at pp. 607-610 [40 L.Ed.2d at pp. 413-415]; *Arnett* v. *Kennedy, supra,* 416 U.S. at pp. 167-171 [40 L.Ed.2d at pp. 40-43] (concurring opn., Justice Powell), pp. 188-193 [40 L.Ed.2d pp. 52-56] (concurring and dissenting opn., Justice White); see *Beaudreau* v. *Superior Court, supra,* 14 Cal.3d 448, 463-464.)

These principles have been applied by the high court to measure the constitutional validity of state statutes granting creditors certain prejudgment summary remedies. In *Mitchell* v. *W. T. Grant Co., supra,* 416 U.S.

600, the court upheld against due process attack a Louisiana statute authorizing a state trial judge to order sequestration of a debtor's personal property upon the creditor's ex parte application, noting that both the creditor and the debtor had interests in the particular property seized,[24] that the creditor's interest might be seriously jeopardized by preseizure notice and hearing,[25] and that adequate alternative procedural safeguards, including an immediate postdeprivation hearing, were accorded the debtor.[26] On the other hand, the high court struck down a Georgia statute permitting garnishment of a debtor's property pending litigation on the alleged debt "without notice or opportunity for an early hearing and without participation by a judicial officer." (*North Georgia Finishing, Inc.* v. *Di-Chem, Inc., supra,* 419 U.S. 601, 606 [42 L.Ed.2d 751, 757].) In reaching its decision, the court emphasized that "[t]he Georgia garnishment statute has none of the saving characteristics of the Louisiana statute." (*Id.,* at p. 607 [42 L.Ed.2d at p. 757].)

This modified position of the United States Supreme Court regarding such due process questions has also extended to the form of the hearing required. In *Goss* v. *Lopez, supra,* 419 U.S. 565, the court held that Ohio public school students had a property as well as a liberty interest in their education and that they were therefore entitled to notice and hearing before they could be suspended or expelled from school. (*Id.,* at pp. 574-581 [42 L.Ed.2d at pp. 734-739].) However, where the suspension was short, the court concluded that the required "hearing" need be only an informal discussion between student and disciplinarian, at which the student should be informed of his alleged misconduct and permitted to explain his version of the events. (*Id.,* at pp. 581-582 [42 L.Ed.2d at p. 738-739].) Such a procedure, the court reasoned, "will provide a meaningful hedge against erroneous action." (*Id.,* at p. 583 [42 L.Ed.2d at p. 740].) On the other hand, the court carefully pointed out the limitations on its holding: "We stop short of construing the Due Process

---

[24]Under the terms of the statute, the trial judge could order sequestration only if the creditor proved by affidavit that he had a vendor's lien on the property and that the debtor had defaulted in making the required payments, thereby entitling the creditor to immediate possession. (*Id.,* at pp. 605-606 [40 L.Ed.2d at pp. 412-413].)

[25]The court noted that the debtor might abscond with the property and that in any event the debtor's continued use thereof would decrease the property's value. (*Id.,* at pp. 608-609 [40 L.Ed.2d at pp. 413-415].)

[26]The creditor was required to post a bond to cover the debtor's potential damages in the event of a wrongful taking. At the postdeprivation hearing which was immediately available to the debtor, the creditor had the burden of making a prima facie showing of entitlement to the property. If he failed to do so, the debtor was entitled to return of his property and to an award of any damages. (*Id.,* at pp. 606-610 [40 L.Ed.2d at pp. 412-415].)

Clause to require, countrywide, that hearings in connection with short suspensions must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident. Brief disciplinary suspensions are almost countless. To impose in each such case even truncated trial-type procedures might well overwhelm administrative facilities in many places and, by diverting resources, cost more than it would save in educational effectiveness. Moreover, further formalizing the suspension process and escalating its formality and adversary nature may not only make it too costly as a regular disciplinary tool but also destroy its effectiveness as part of the teaching process." (*Id.,* at p. 583 [42 L.Ed.2d at p. 740].)

Our present task of determining the requirements of due process under the particular circumstances of the case at bench is made easier by the Supreme Court's decision in *Arnett* v. *Kennedy, supra,* 416 U.S. 134, upholding against constitutional attack the statutory procedure for the disciplining of nonprobationary federal civil service employees. Initially, we note that the rationale adopted by the plurality opinion of Justice Rehnquist, joined by the Chief Justice and Justice Stewart, would obviate the need for any balancing of competing interests. This rationale would apparently permit a state to narrowly circumscribe the procedures for depriving an individual of a statutorily created property right by simply establishing in the statute a procedural mechanism for its enforcement. (*Id.,* at pp. 153-155 [40 L.Ed.2d at pp. 32-34].) In such instances, it is reasoned, the individual "must take the bitter with the sweet," that is, the substantive benefit of the statute together with the procedural mechanism it prescribes to safeguard that benefit. (*Id.,* at pp. 153-154 [40 L.Ed.2d at pp. 32-33].) Under this rationale, it is arguable that California's procedure for disciplining civil service employees would withstand petitioner's due process attack, since the substantive right of a permanent state worker to continued employment absent cause (§ 19500) may be "inextricably intertwined [in the same set of statutes] with the limitations on the procedures which are to be employed in determining that right . . . ." (*Id.,* at pp. 153-154 [40 L.Ed.2d at p. 33].)

However, this theory was unequivocally rejected by the remaining six justices and indeed described by the dissenters as "a return, albeit in somewhat different verbal garb, to the thoroughly discredited distinction between rights and privileges which once seemed to govern the applicability of procedural due process. [Fn. omitted.]" (See Justice Marshall's dissenting opn. at p. 211 [40 L.Ed.2d at p. 66]; see also Justice

Powell's concurring opn. at pp. 165-167 [40 L.Ed.2d at pp. 39-41], and Justice White's concurring and dissenting opn. at pp. 177-178, 185 [40 L.Ed.2d at pp. 46-47, 51].)

Where state procedures governing the taking of a property interest are at issue, all six justices were of the view that the existence of the interest is to be determined in the first place under applicable state law, but that the adequacy of the procedures is to be measured in the final analysis by applicable constitutional requirements of due process. (*Id.*, at p. 167 [40 L.Ed.2d at pp. 40-41] (concurring opn., Justice Powell), p. 185 [40 L.Ed.2d p. 51] (concurring and dissenting opn., Justice White), p. 211 [40 L.Ed.2d p. 66] (dissenting opn., Justice Marshall).) "While the legislature may elect not to confer a property interest in . . . [civil service] employment [fn. omitted], it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards." (*Id.*, at p. 167 [40 L.Ed.2d at pp. 40-41] (concurring opn., Justice Powell); see also Justice White's concurring and dissenting opn. at p. 185 [40 L.Ed.2d at p. 51], and Justice Marshall's dissenting opn. at p. 211 [40 L.Ed.2d at p. 66].)

In *Arnett,* the remaining six justices were of the opinion that a full evidentiary "hearing must be held at some time before a competitive civil service employee maybe *finally* terminated for misconduct." (*Id.*, at p. 185 [40 L.Ed.2d at p. 51], italics added (concurring and dissenting opn., Justice White); see also, Justice Powell's concurring opn. at p. 167 [40 L.Ed.2d at pp. 40-41], and Justice Marshall's dissenting opn. at p. 212 [40 L.Ed.2d at pp. 66-67].) The question then narrowed to whether such a hearing had to be afforded *prior* to the time that the *initial* removal decision became effective. (*Id.*, at p. 167 [40 L.Ed.2d at pp. 40-41] (concurring opn., Justice Powell), p. 186 [40 L.Ed.2d at pp. 51-52] (concurring and dissenting opn., Justice White), p. 217 [40 L.Ed.2d at pp. 69-70] (dissenting opn., Justice Marshall).)

In resolving this question, the above justices utilized a balancing test, weighing "the Government's interest in expeditious removal of an unsatisfactory employee . . . against the interest of the affected employee in continued public employment." (*Id.*, at pp. 167-168 [40 L.Ed.2d at p. 41] (concurring opn., Justice Powell); see also Justice White's concurring and dissenting opn. at p. 188 [40 L.Ed.2d at pp. 52-53], and Justice Marshall's dissenting opn. at p. 212 [40 L.Ed.2d at pp. 66-67].) On one side was the government's interest in "the maintenance of employee efficiency and discipline. Such factors are essential if the Government is

to perform its responsibilities effectively and economically. To this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency. Moreover, a requirement of a prior evidentiary hearing would impose additional administrative costs, create delay, and deter warranted discharges. Thus, the Government's interest in being able to act expeditiously to remove an unsatisfactory employee is substantial. [Fn. omitted.]" (*Id.*, at p. 168 [40 L.Ed.2d at p. 41] (concurring opn., Justice Powell); see also Justice White's concurring and dissenting opn. at pp. 193-194 [40 L.Ed.2d at pp. 55-56] and Justice Marshall's dissenting opn. at pp. 223-225 [40 L.Ed.2d at pp. 73-74].)

Balanced against this interest of the government was the employee's countervailing interest in the continuation of his public employment pending an evidentiary hearing: "During the period of delay, the employee is off the Government payroll. His ability to secure other employment to tide himself over may be significantly hindered by the outstanding charges against him. [Fn. omitted.] Even aside from the stigma that attends a dismissal for cause, few employers will be willing to hire and train a new employee knowing that he will return to a former Government position as soon as an appeal is successful. [Fn. omitted.] And in many States, . . . a worker discharged for cause is not even eligible for unemployment compensation. [Fn. omitted.]"[27] (*Id.*, at pp. 219-220 [40 L.Ed.2d at p. 71] (dissenting opn., Justice Marshall); see also, Justice White's concurring and dissenting opn. at pp. 194-195 [40 L.Ed.2d at pp. 56-57] and Justice Powell's concurring opn. at p. 169 [40 L.Ed.2d at p. 42].)

The justices reached varying conclusions in resolving this balancing process. Justice Powell, joined by Justice Blackmun, concluded that the federal discharge procedures comported with due process requirements. In reaching this result, however, he emphasized the numerous preremoval safeguards accorded the employee as well as the right to compensa-

---

[27]Under California law, "[a]n individual is disqualified for unemployment compensation benefits if the director finds that . . . he has been discharged for misconduct connected with his most recent work." (Unemp. Ins. Code, § 1256.) Thus, a state civil service employee who has been discharged for cause may be disqualified from receiving unemployment compensation in some circumstances.

tion guaranteed the latter if he prevailed at the subsequent evidentiary hearing: "The affected employee is provided with 30 days' advance written notice of the reasons for his proposed discharge and the materials on which the notice is based. He is accorded the right to respond to the charges both orally and in writing, including the submission of affidavits. Upon request, he is entitled to an opportunity to appear personally before the official having the authority to make or recommend the final decision. Although an evidentiary hearing is not held, the employee may make any representations he believes relevant to his case. After removal, the employee receives a full evidentiary hearing, and is awarded backpay if reinstated. See 5 CFR §§ 771.208 and 772.305; 5 U.S.C. § 5596. These procedures minimize the risk of error in the initial removal decision and provide for compensation for the affected employee should that decision eventually prove wrongful. [Fn. omitted.]." (*Id.,* at p. 170 [40 L.Ed.2d at p. 42].)

Justice White, concurring in part and dissenting in part, agreed that due process mandated some sort of preliminary notice and hearing, and similarly "conclude[d] that the statute and regulations provisions to the extent they require 30 days' advance notice and a right to make a written presentation satisfy minimum constitutional requirements." (*Id.,* at pp. 195-196 [40 L.Ed.2d at p. 57].)[28]

Justice Marshall, joined by Justices Douglas and Brennan, dissented, apparently adhering to the "former due process test" requiring an "unusually important governmental need to outweigh the right to a prior hearing."[29] (*Id.,* at p. 222 [40 L.Ed.2d at pp. 72-73], quoting from *Fuentes* v. *Shevin, supra,* 407 U.S. at p. 91, fn. 23 [32 L.Ed.2d at p. 576]; see also Justice Marshall's dissenting opn. at pp. 217-218, 223 [40 L.Ed.2d at pp. 69-70, 73].) Finding that the government's interest in prompt removal of an unsatisfactory employee was not the sort of vital concern justifying resort to summary procedures, the dissenters concluded that a nonprobationary employee was entitled to a full evidentiary hearing prior to discharge, at which he could appear before an independent, unbiased decisionmaker and confront and cross-examine adverse witnesses. (*Id.,* at pp. 214-216, 226-227 [40 L.Ed.2d at pp. 67-69, 74-75].)

[28]Justice White's dissent was based upon his view that the employee in *Arnett* had not been accorded an impartial hearing officer in the pretermination proceeding, which he found was required by both due process and the federal statutes. (*Id.,* at p. 199 [40 L.Ed.2d at p. 59].)

[29]Justice Douglas also wrote a separate dissenting opinion in which he concluded that the employee in *Arnett* had been fired for exercising his right of free speech, and therefore that the discharge violated the First Amendment to the United States Constitution. (*Id.,* at pp. 203-206 [40 L.Ed.2d at pp. 61-63].)

Applying the general principles we are able to distill from these various opinions, we are convinced that the provisions of the California Act concerning the taking of punitive action against a permanent civil service employee do not fulfill minimum constitutional demands. ■ It is clear that due process does not require the state to provide the employee with a full trial-type evidentiary hearing prior to the initial taking of punitive action. However, at least six justices on the high court agree that due process does mandate that the employee be accorded certain procedural rights before the discipline becomes effective. As a minimum, these preremoval safeguards must include notice of the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the right to respond, either orally or in writing, to the authority initially imposing discipline.

California statutes governing punitive action provide the permanent employee with none of these prior procedural rights. Under section 19574, the appointing power is authorized to take punitive action against a permanent civil service employee by simply notifying him thereof. The statute specifies no particular form of notice, nor does it require advance warning. Thus, oral notification at the time of the discipline is apparently sufficient. (See 29 Ops.Cal.Atty.Gen. 115, 120 (1957), and Personnel Transactions Man., March 1972.) The employee need not be informed of the reasons for the discipline or of his right to a hearing until 15 days *after* the effective date of the punitive action. (§ 19574.) It is true that the employee is entitled to a full evidentiary hearing within a reasonable time thereafter (§ 19578), and is compensated for lost wages if the Board determines that the punitive action was improper. (§ 19584.) However, these postremoval safeguards do nothing to protect the employee who is wrongfully disciplined against the temporary deprivation of property to which he is subjected pending a hearing. ■ Because of this failure to accord the employee any prior procedural protections to "minimize the risk of error in the initial removal decision" (*Arnett* v. *Kennedy, supra,* 416 U.S. at p. 170 [40 L.Ed.2d at p. 42] (concurring opn., Justice Powell)), we hold that the provisions of the State Civil Service Act, including in particular section 19574, governing the taking of punitive action against a permanent civil service employee violate the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution and of article I, sections 7 and 15 of the California Constitution.

Defendants fail to persuade us to the contrary. Relying upon cases which antedate *Arnett* v. *Kennedy, supra,* 416 U.S. 134, defendants first contend that we must apply a different and less stringent standard of due

process in judging the state's exercise of a "proprietary" as opposed to a "regulatory" function. Where the state is acting as an "employer," so the argument goes, the balancing process must be more heavily weighted in favor of insuring flexibility in its operation; therefore, due process is satisfied as long as a hearing is provided at some stage of the proceedings. The Supreme Court's decision in *Arnett* v. *Kennedy, supra,* 416 U.S. 134, adequately disposes of this argument. In view of our extensive analysis of this decision we need not say anything further except to observe that nowhere in that case does any member of the high court advocate the distinction advanced by defendants.

Defendants further contend that emergency circumstances may arise in which the immediate removal of an employee is essential to avert harm to the state or to the public. Adverting to section 19574.5,[30] which permits the appointing power to order an employee on leave of absence for a limited period of time, defendants argue that situations not covered by this statute but necessitating similar prompt action may conceivably arise under section 19574 (see fn. 12, *ante*). In answering this argument, we need only point out that section 19574 is not limited to the extraordinary circumstances which defendants conjure up. (*Sniadach* v. *Family Finance Corp., supra,* 395 U.S. 337, 339 [23 L.Ed.2d 349, 352]; *Randone* v. *Appellate Department, supra,* 5 Cal.3d at pp. 541, 553; *Blair* v. *Pitchess, supra,* 5 Cal.3d at p. 279.) Indeed, the instant case presents an example of the statute's operation in a situation requiring no special protection of the state's interest in prompt removal. (*Sniadach, supra,* 395 U.S. at p. 339 [23 L.Ed.2d at p. 352].) Thus, since the statute "does not narrowly draw into focus those 'extraordinary circumstances' in which [immediate action] may be actually required," we remain convinced that the California procedure governing punitive action fails to satisfy either federal or state due process standards. (*Randone* v. *Appellate Department, supra,* 5 Cal.3d at p. 541.)

[30]Section 19574.5 provides: "Pending investigation by the appointing power of accusations against an employee involving misappropriation of public funds or property, drug addiction, mistreatment of persons in a state institution, immorality, or acts which would constitute a felony or a misdemeanor involving moral turpitude, the appointing power may order the employee on leave of absence for not to exceed 15 days. The leave may be terminated by the appointing power by giving 48 hours' notice in writing to the employee.

"If punitive action is not taken on or before the date such a leave is terminated, the leave shall be with pay.

"If punitive action is taken on or before the date such leave is terminated, the punitive action may be taken retroactive to any date on or after the date the employee went on leave. Notwithstanding the provisions of Section 19574, the punitive action, under such circumstances, shall be valid if written notice is served upon the employee and filed with the board not later than 15 calendar days after the employee is notified of the punitive action."

## II

■ ■■■ ,Having determined that the procedure used to dismiss petitioner denied him due process of law as guaranteed by both the United States Constitution and the California Constitution, we proceed to examine under the well established standards of review[31] the Board's action taken against petitioner. Petitioner first contends that the Board's findings are not supported by substantial evidence. Specifically he disputes the Board's determination that his absences on March 16 and June 26, 1972, were due to his drinking rather than to illness.

■ The findings challenged are based upon the testimony of two apparently credible witnesses, Gerald Green and Bernard Moore, who stated that they personally observed petitioner at a bar drinking on the dates in question. With respect to the June 26th incident, petitioner himself testified that he had consumed two martinis at lunch, despite his illness. Clearly this evidence is sufficient to support the Board's findings with respect to the cause of petitioner's absences on these two occasions.

## III

Petitioner finally contends that the penalty of dismissal is clearly excessive and disproportionate to his alleged wrong. We agree.

Generally speaking, "[i]n a mandamus proceeding to review an administrative order, the determination of the penalty by the administrative body will not be disturbed unless there has been an abuse of its discretion." (*Magit* v. *Board of Medical Examiners* (1961) 57 Cal.2d 74, 87 [17 Cal.Rptr. 488, 366 P.2d 816]; see also *Nightingale* v. *State Personnel Board* (1972) 7 Cal.3d 507, 514-516 [102 Cal.Rptr. 758, 498 P.2d 1006]; *Harris* v. *Alcoholic Bev. etc. Appeals Bd.* (1965) 62 Cal.2d 589, 594 [43 Cal.Rptr. 633, 400 P.2d 745]; *Martin* v. *Alcoholic Bev. etc. Appeals Bd.* (1961) 55 Cal.2d 867, 876 [13 Cal.Rptr. 513, 362 P.2d 337].) ■ Nevertheless, while the administrative body has a broad discretion in respect to the imposition of a penalty or discipline, "it does not have absolute and unlimited power. It is bound to exercise legal

---

[31]The Board is "a statewide administrative agency which derives [its] adjudicating power from [article XXIV, section 3, of] the Constitution . . . [; therefore, its factual determinations] are·not subject to re-examination in a trial de novo but are to be upheld by a reviewing court if they are supported by substantial evidence. [Citations.]" (*Shepherd* v. *State Personnel Board* (1957) 48 Cal.2d 41, 46 [307 P.2d 4]; see also *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 35-36 [112 Cal.Rptr. 805, 520 P.2d 29].)

discretion, which is, in the circumstances, judicial discretion." (*Harris, supra,* citing *Martin, supra,* and *Bailey* v. *Taaffe* (1866) 29 Cal. 422, 424.) In considering whether such abuse occurred in the context of public employee discipline, we note that the overriding consideration in these cases is the extent to which the employee's conduct resulted in, or if repeated is likely to result in, "[h]arm to the public service." (*Shepherd* v. *State Personnel Board, supra,* 48 Cal.2d 41, 51; see also *Blake* v. *State Personnel Board* (1972) 25 Cal.App.3d 541, 550-551, 554 [102 Cal.Rptr. 50].) Other relevant factors include the circumstances surrounding the misconduct and the likelihood of its recurrence. (*Blake, supra,* at p. 554.)

■ Consideration of these principles in the instant case leads us to conclude that the discipline imposed was clearly excessive. The evidence adduced at the hearing and the hearing officer's findings, adopted by the Board, establish that the punitive dismissal was based upon the doctor's conduct in extending his lunch break beyond his allotted one hour on numerous occasions, generally by five to fifteen minutes, and in twice leaving the office for several hours without permission. It is true that these transgressions continued after repeated warnings and admonitions by administrative officials, who made reasonable efforts to accommodate petitioner's needs. It is also noteworthy that petitioner had previously suffered a one-day suspension for similar misconduct.

However, the record is devoid of evidence directly showing how petitioner's minor deviations from the prescribed time schedule adversely affected the public service.[32] To the contrary, the undisputed evidence indicates that he more than made up for the excess lunch time by working through coffee breaks as well as on some evenings and holidays. With perhaps one or two isolated exceptions,[33] it was not shown that his conduct in any way inconvenienced those with whom he worked or prevented him from effectively performing his duties.

Dr. Hale, senior medical consultant and petitioner's immediate supervisor for about 13 months, rated his work as good to superior, compared it favorably with that of other physicians in the office, and described him as efficient, productive, and the region's "right hand man" on ear, nose and throat problems. Two other employees who worked with petitioner testified that he was informative, cooperative, helpful,

[32]Mr. Green testified on cross-examination that there was some latitude with respect to the hours kept by professional people in the office, as long as they worked 40 hours per week and received Green's approval.

[33]Apparently, petitioner's unexcused absence on the afternoon of June 26, 1972, inconvenienced Moore who wished to see him on a routine business matter.

extremely thorough and productive. No contrary evidence was presented by or on behalf of the Department of Health Care Services.

In his proposed decision, adopted by the Board, the hearing officer stated: "Appellant is 64 years old, has had a long and honorable medical career and is now handicapped by serious sight and speech difficulties. Also, the Senior Medical Consultant has no complaints about appellant's work. [¶] Consideration of appellant's age, his physical problems, the lack of any apparent affect on his work and sympathy for the man and his family are all persuasive arguments in favor of finding that appellant be given just one more chance." In testifying, petitioner apologized for his conduct and promised to adhere strictly to the rules if given another opportunity to do so.

Our views on this issue should not be deemed, nor are they intended, to denigrate or belittle administrative interest in requiring strict compliance with work hour requirements. The fact that an employee puts in his 40 hours per week by rearranging his breaks to suit his personal convenience is not enough. An administrator may properly insist upon adherence to a prescribed time schedule, as this may well be essential to the maintenance of an efficient and productive office. Nor do we imply that an employee's failure to comply with the rules regulating office hours may not warrant punitive action, possibly in the form of dismissal, under the appropriate circumstances. Indeed, in the instant case, a less severe discipline is clearly justified; and we do not rule out the possibility of future dismissal if petitioner's transgressions persist.

However, considering all relevant factors in light of the overriding concern for averting harm to the public service, we are of the opinion that the Board clearly abused its discretion in subjecting petitioner to the most severe punitive action possible for his misconduct.

In sum, we conclude that the dismissal of petitioner was improper for two reasons: First, the procedure by which the discharge was effectuated denied him due process of law, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, and article I, sections 7 and 15, of the California Constitution; second, the penalty of dismissal was clearly excessive and disproportionate to the misconduct on which it was based.

Therefore, upon remand the trial court should issue a peremptory writ of mandate directing the State Personnel Board to annul and set aside its

decision sustaining without modification the punitive action of dismissal taken by the State Department of Health Care Services against petitioner John F. Skelly, M.D., and to reconsider petitioner's appeal in light of this opinion.[34]

The judgment is reversed and the cause is remanded to the trial court for further proceedings in conformity with this opinion.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Clark, J., and Molinari, J.,* concurred.

Respondents' petition for a rehearing was denied October 15, 1975. Richardson, J., did not participate therein.

---

[34]As petitioner has heretofore been accorded a full evidentiary hearing in this matter, it is unnecessary for the Board to order the Department to reinstitute new proceedings against him in order to impose an appropriate discipline in respect to the conduct involved herein.

*Assigned by the Chairman of the Judicial Council.