Filed 2/3/16  Saavedra v. City of Oakland CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ARNOLD SAAVEDRA,<br><br>          Plaintiff and Appellant,<br><br>v.<br><br>CITY OF OAKLAND et al.,<br><br>          Defendants and Respondents. | A142088<br><br>(Alameda County<br>Super. Ct. No. RG11559931) |

Arnold Saavedra sued the City of Oakland (City) and two City supervisors for claims related to discrimination and retaliation in the workplace.  The trial court granted summary judgment to the City, ruling that all of Saavedra's claims were barred by failure to exhaust administrative and judicial remedies, and that Saavedra failed to raise triable issues of fact that he suffered adverse employment actions resulting from either discrimination or retaliation.  We reverse those rulings.  The court also determined that Saavedra's tort and Labor Code claims were time-barred, a ruling which we affirm.  Accordingly, we reverse the judgment in part and remand for further proceedings.

## I.    FACTUAL BACKGROUND

We summarize the evidence that was submitted in support of and in opposition to summary judgment and cited in the separate statement of undisputed facts and the response and reply thereto.[1]  (See *Parkview Villas Assn., Inc. v. State Farm Fire &*

---

[1] As explained *post,* the second part of Saavedra's response to the separate statement (linking the alleged undisputed facts to issues raised in the City's motion) is incomplete and at times inconsistent with the first part (which responds to each of the

1

*Casualty Co.* (2005) 133 Cal.App.4th 1197, 1213 [citing " 'golden rule' " of summary judgment: " ' "if it is not set forth in the separate statement, *it does not exist*" ' "].) We disregard evidence if the trial court sustained an objection and the court's ruling is not challenged on appeal, and we consider evidence if the trial court overruled an objection and the objection is not renewed on appeal.[2] (*Frittelli, Inc. v. 350 North Canon Drive, LP* (2011) 202 Cal.App.4th 35, 41 & fn. 1.) We resolve conflicts in the evidence and draw reasonable inferences in the light most favorable to Saavedra, as the party opposing summary judgment. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.)

A.     *1999 to May 2008:  7101 Edgewater Drive*

Saavedra, who is Mexican and Native American, was hired in 1999 as a part-time custodian for the City's Public Works Agency, a nonpermanent position. From 2004 to 2007, he worked on a "roving crew" based at 7101 Edgewater Drive (Edgewater) under the supervision of Renay Jackson. Saavedra was not reimbursed for work use of his personal car during this assignment.[3] In July 2007, he applied for a full-time position and was qualified for the position, but an African-American with less seniority was hired.

B.     *May 2008 to March 2010:  Civic Center Complex*

In May 2008, Saavedra was promoted to permanent part-time custodian and assigned to the Civic Center Complex, which includes both 150 and 250 Frank Ogawa

City's 103 alleged undisputed material facts). We have considered only evidence cited in the first part of the separate statement and the response and reply thereto.

[2] The trial court sustained several objections to Saavedra's evidence, and Saavedra fails to challenge those rulings on appeal. The trial court overruled all of Saavedra's objections to the City's evidence, and Saavedra fails to renew those objections on appeal. In a footnote, the City renews one evidentiary objection that was overruled by the trial court. Even assuming this objection was properly presented in such an indirect manner, we need not rule on it, as explained *post*.

[3] Although Saavedra confirmed at his deposition that he was "paid for all of the reimbursements for use of [his] personal vehicle from the time [he was] at Edgewater," it was not clear in context whether he was referring to his employment at Edgewater in 2004 to 2007 or only to a later assignment at Edgewater in 2010. We resolve the ambiguity in Saavedra's favor. (See *Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 843.)

Plaza (150 Plaza and 250 Plaza). His supervisors were Facilities Complex Manager Derin Minor and Custodial Supervisor Damien Thomas.

### 1. *Working Conditions*

Minor assigned Saavedra to an eight-hour (full-time) position at 250 Plaza, but Saavedra was required to do the work in seven hours and received only seven hours' pay. Thomas showed favoritism toward the African-American custodians, who were relatives or friends of Minor and Thomas. Thomas ordered Saavedra to perform work that these custodians refused to do or had left undone while they took unauthorized or lengthy breaks. "You know, he'll pull me from doing my job duties . . . to come and do someone else's [work], while the person stands right there and tells him no." Thomas also singled out Saavedra for criticism. For example, he yelled at Saavedra for arriving late to a gathering when African-American custodians had not yet arrived, and he criticized Saavedra in front of other custodians for taking time off to attend his wife's medical appointments even though those absences had been approved by Minor. When Saavedra complained about the disparate treatment, Thomas got angry and said, "[J]ust do what I tell you." Saavedra believed that Thomas reported his complaints to Minor because Minor spoke to Thomas every day, told Saavedra not to talk back to Thomas, and became more firm or direct with Saavedra.

In November 2008, Minor assigned Saavedra to 150 Plaza to replace African-American custodian Arthur Couch and gave Couch Saavedra's former position. Minor made the transfer to protect Couch, who was suspected of sexual harassment and other misconduct at 150 Plaza. Couch had a full-time eight-hour schedule, but Saavedra was required to do the same work in seven hours and for seven hours' pay. Saavedra complained to Thomas about the transfer.

### 2. *Suspension*

At 150 Plaza, Saavedra took over as day porter assigned to the eighth floor of the Lionel J. Wilson Building. Couch had worked in the position for more than eight years and had stored many personal items in the eighth-floor custodial closet, including pornographic magazines. Saavedra told Thomas about the magazines and Thomas said to

3

leave them there. Saavedra believed Minor was also aware of the magazines because he often visited his friend Couch at the closet.

Both day and evening custodians used the custodial closet. Because the evening custodians frequently failed to restock the closet, Saavedra asked Thomas for permission to stash extra supplies in a "DIT" (apparently the Department of Information Technology) closet on the eighth floor and Thomas consented. On March 19 or 20, 2009, Saavedra was tucking in his shirt by the DIT closet when someone started to enter the room and quickly fled. Saavedra left a note that said: "Sorry for scaring you[.] I leave my . . . supplies in here! You just caught me on a bad time when I was fixing my shirt & pants!"

In March 2009, Minor searched the Wilson building's custodial closets and DIT rooms for a missing television monitor. In the process of that search, he came across Saavedra's note in a DIT communications room and three pornographic magazines in the custodial closet (two inside a first aid kit and one on a shelf). Thomas identified the handwriting on the note as Saavedra's.

On March 23, 2009, Saavedra called Thomas to report that someone had taken magazines from the custodial closet. On March 25, Thomas asked Saavedra to describe the incident in more detail, and Saavedra wrote: "I noticed personal items were moved . . . . [Three] personal magazines were stolen. Note that these magazines were not in open view. . . . [N]ow I'm aware that this is a common area to not keep personal items." Although other custodians had access to the closet, there is no evidence that anyone other than Saavedra was investigated regarding the magazines.

Also on March 23, 2009, Thomas was asked to locate a missing air pump. Thomas inspected the basement storage area and could not locate the pump. He spoke to three custodians who helped move boxes in February and they all recalled seeing the air pump and denied taking it. According to Saavedra, Thomas hung up the phone before

4

Saavedra could tell him that he had placed the pump in an e-waste container.[4] Saavedra called Thomas back, but Thomas did not answer his phone. Saavedra retrieved the pump from the e-waste container and returned it to the basement storage area and called Thomas to say he had returned the pump. Minor later reviewed surveillance video footage that showed Saavedra entering the building with a box under his arm between the time Thomas first searched the basement and when the pump was found. Building access records confirmed that Saavedra left and reentered the building at that time.

Minor reported the results of his investigation to the City's human resources department. On May 27, 2009, Saavedra was called to a meeting with Minor and Trinette Gist Skinner of human resources. According to Minor and Skinner, Saavedra admitted that the three pornographic magazines were his and denied knowing how the air pump got into the basement storage area. Saavedra avers that he told Minor and Skinner he was unaware of the magazines in the first aid kit and that he did not steal the air pump. Skinner recommended that Saavedra be disciplined. In July 2009, Saavedra was turned down for a promotion to a full-time position and an African-American with less seniority was selected.

On March 15, 2010, the City sent Saavedra a "Notice of Intent to Terminate" for accessing an unauthorized area (the DIT room), maintaining pornography on work property, and stealing the air pump. Saavedra responded with a five-page written statement. Regarding the air pump, he claimed he had put it in the e-waste container in February 2009. An April 1, 2010 *Skelly*[5] hearing was attended by Saavedra, his union representative, and *Skelly* officer Steve Danziger. Danziger interviewed witnesses and

---

[4] Back in February 2009, Thomas assigned Saavedra to help move boxes from a storage site to the basement of 150 Plaza. A few days later, Thomas told Saavedra to help sort through those boxes with another City employee, who indicated which boxes should be saved and which discarded. Saavedra discarded boxes of Christmas ornaments, bicycle parts and old files, as well as a box that contained an air pump with caution tape on it. Because it was electrical equipment, Saavedra put the pump in an e-waste container.

[5] *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194.

wrote an April 28 report of his investigation. Regarding use of the DIT room, Saavedra told Danziger that Thomas had given him permission to store supplies there, but Thomas denied doing so. Danziger found that the City failed to establish that the DIT room was an unauthorized area for Saavedra and that Saavedra's story was credible. Regarding the pornographic magazines, "[Saavedra] admitted that he told [Thomas and Minor] the magazines were his but [said] he did not mean they were purchased by him and personally belonged to him." Danziger noted that two of the magazines were from 1994 and 2006. Saavedra told Danziger that Thomas knew about the magazines in 2008 and that Couch had recently admitted to him that the magazines were in the closet when he worked there. Thomas and Couch both denied such knowledge. Regarding the air pump, Danziger wrote that "Saavedra's story about placing the air-pump in the e-waste area sounds plausible (and seems to be supported by the access wipe report and videotape), but [Saavedra] was not truthful when asked about the missing pump and putting it back in the basement. As far as I know, telling me about putting it in the e-waste area was the first time anyone knew of this."

Danziger concluded, "The evidence clearly indicates that someone is being untruthful and . . . my conclusion is that it was [Saavedra]. None of the statements he attributed to [Thomas or Couch] were confirmed. In addition, he returned the air-pump but was not forthcoming about how it got there. . . . [M]aintaining pornographic materials in the work place is a serious offense and worthy of a lengthy suspension." In light of Saavedra's long tenure, positive performance reviews, and clean disciplinary record, Danziger recommended imposition of a 20-day suspension in lieu of termination.

The deputy city attorney who reviewed the matter met with Saavedra and his union representative and inspected relevant building locations with Saavedra. She made a settlement offer to reduce the discipline to a five-day suspension on the condition he successfully complete one year of probation. Saavedra rejected the offer. The City issued a notice of suspension on July 30, 2010, based on all three alleged violations; Saavedra served the 20-day suspension in August and September 2010.

6

C.    *March to December 2010:  Edgewater*

On March 16, 2010, the day after Saavedra received the Notice of Intent to Terminate, Minor reassigned Saavedra to work at Edgewater, apparently over Saavedra's objections.  Reimbursements for Saavedra's work use of his personal car during this assignment were delayed for eight months.

D.    *January 2011 to Present:  Oakland Police Department*

In January 2011, Minor assigned Saavedra to an Oakland Police Department (OPD) location, where he was supervised by Jackson, Everett Cleveland, and Harold Bowles.  Saavedra objected to the transfer.  At OPD, he no longer received reimbursement for use of his personal vehicle (although he also no longer had to use his vehicle for work), which Saavedra considered lower pay.  Saavedra took over a position that had been held by an African-American full-time custodian, but Saavedra was required to do the job on a part-time schedule.  Minor directed Cleveland to escort Saavedra through a four-hour background check that included fingerprinting, whereas other custodians (including African-Americans) were not escorted through the process.  Saavedra complained to Cleveland about the disparate treatment.  Cleveland repeatedly checked on Saavedra and asked why he did not like working at OPD.

Sometime in 2011, Saavedra was asked to sign a performance evaluation for the May 2010-April 2011 period that included a statement that he had taken time off for personal reasons, a reference to his approved 12-week leave (pursuant to the Family and Medical Leave Act) in 2009.  Although Cleveland was Saavedra's immediate supervisor at the time the evaluation was presented to Saavedra, the evaluation was initially signed by Minor and later by Jackson.  When Saavedra complained about the comment, Minor, Bowles and Jackson refused to remove it, but the comment was eventually deleted.

While Saavedra worked at OPD, Roslyn Ratliff, an African-American custodian who was not Saavedra's supervisor but who appeared to be close to his then supervisor Bowles, surveilled and harassed him.  On August 30, 2011, Ratliff prevented Saavedra from taking his break, on October 21 and 31 she asked about his whereabouts, and on November 21 she checked on him and took photographs of his work.  When Ratliff

7

checked the crew's work at the end of the day and found unfinished work in Saavedra's area, she would not have a custodian complete the work per her usual custom but would report the problem to Bowles. Saavedra received a disciplinary notice from Bowles that accused him of failing to clean a restroom, with pictures attached. Saavedra pointed out that the restroom in question was a women's room that was not assigned to him, but Bowles insisted it was. Bowles eventually agreed to investigate and later retracted the write-up. Saavedra complained to Bowles about Ratliff's harassment to no avail.

Bowles treated African-American employees more favorably than Saavedra. He repeatedly let an African-American custodian named Ricky take extra breaks to take care of personal business. Ricky, who spoke frequently with Bowles by phone, asked other custodians about Saavedra, giving him the impression that Bowles had told Ricky to "keep an eye" on him. Minor also hired a White male external candidate for a full-time position at OPD while Saavedra was working there.

On January 19, 2012, Saavedra received a layoff notice. The notice was left for him in the break room, readily visible to other employees. Saavedra should not have been laid off because of his seniority status. On January 23, a retraction of the layoff notice was left for Saavedra, again in the break room.

E.      *Litigation*

In February 2011, Saavedra filed a complaint against the City, Minor, Thomas, and Doe defendants. He asserted claims for race discrimination, racial and retaliatory harassment, retaliation, and hostile work environment in violation of the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.; *id.*, § 12940). He also asserted claims for violation of Labor Code section 1102.5 et seq., wrongful discipline in violation of public policy, and defamation. Defendants (collectively the City) moved for summary judgment. After two continuances, Saavedra filed opposition papers that failed to comply with the rules of court. The court issued an order to show cause requiring Saavedra to show why he and his attorney should not be sanctioned for the rule violations. After a hearing on both the order to show cause and the summary

8

judgment motion, the court issued a written order granting summary judgment on the merits. The court entered judgment for the City and Saavedra appeals.

## II. DISCUSSION

### A. *Procedural Violations by Saavedra*

The City argues that Saavedra's procedural violations are sufficient grounds alone to affirm the judgment pursuant to Code of Civil Procedure section 437c, subdivision (b)(3). Based on our reading of the record, we conclude the trial court declined to grant summary judgment on this basis. We therefore similarly decline the City's invitation to affirm the judgment on the basis of procedural default.

### 1. *Background*

The City filed its motion on November 22, 2013. The City's separate statement of undisputed material facts was 155 pages long and consisted of two parts: the first 19 pages listed 103 alleged undisputed material facts, and the remaining 136 pages linked those facts to issues that the City raised in its summary judgment motion. On December 27, Saavedra requested a 120-day continuance pursuant to Code of Civil Procedure section 437c, subdivision (h) (and continuance of the trial date pursuant to Cal. Rules of Court, rule 3.1332(c)).[6] The court granted a continuance for about 30 days, and wrote, "No further continuance will be allowed." On March 3, 2014, Saavedra asked for a further continuance and for leave to file amended papers. The court granted the request, continuing the summary judgment hearing to March 28 and ordering amended opposition papers to be filed by March 18.

Saavedra filed amended papers by the deadline. His opposition brief was 53 pages long. The brief's 11-page statement of facts included only two citations to the record, and many facts cited in the brief's discussion section lacked citations to the record. Saavedra's response to the City's statement of undisputed material facts was complete with respect to the statement's first 19 pages, but incomplete and inconsistent with

---

[6] All rule references are to the California Rules of Court.

respect to the remaining 136 pages. The City urged the court to grant the motion based on Saavedra's noncompliant brief and separate statement response.

On March 26, 2014, the court issued an order to show cause: "Saavedra filed a 53-page [brief] . . . , when the page limit is no more than 20 pages. (See . . . [r]ule 3.1113(d).) [¶] [He] did not apply to the court for permission ex parte (at least 24 hours before the memorandum was due), to file a longer memorandum. (See . . . [r]ule 3.1113(e).) [¶] [Saavedra also] filed a separate statement in opposition . . . , which does not comply with [rule] 3.1350(f) . . . . [¶] [Further, t]his court has, on two occasions, continued the motion . . . and in its last order specifically, [Saavedra] was directed to file a new, error free, set of opposition papers. (See Orders dated 12/27/13 and 3/3/14.) [¶] . . . [¶] It appears that nothing short of issuance of monetary sanctions will resonate with [Saavedra and his] counsel." The court continued the summary judgment hearing to April 9, scheduled a hearing on the order to show cause for the same date.

At the April 9, 2014 hearing, the court heard oral argument on the sanctions and the summary judgment motion. The court's written order granting summary judgment concluded, "Notwithstanding the violations, the court did consider the defective papers in opposition to this motion in ruling herein and deems them additional reasons to grant this motion."

2.      *Analysis*

Code of Civil Procedure section 437c, subdivision (b)(3) requires a party opposing summary judgment to file a response to the moving party's separate statement of undisputed material facts, and provides, "Failure to comply with this requirement of a separate statement may constitute a sufficient ground, in the court's discretion, for granting the motion."

We do not read the trial court's statements as indicating that it granted summary judgment on the basis of Saavedra's procedural defaults. In its order to show cause, the court wrote that it appeared that *monetary* sanctions, not a terminating sanction, was necessary to compel compliance with procedural rules. At the April 9, 2014 hearing on the order to show cause and the summary judgment motion, the court explained, "I have

10

the discretion to either deem the whole thing inappropriate and not consider [it], *which I did not do*. I can stop reading after I get to the page limit, *which I did not do*." (Italics added.) When addressing the merits of the summary judgment motion in its written order, the court repeatedly indicated that it had considered "all evidence cited in support of *and in opposition thereto*" (italics added). In the summary judgment order, the court wrote, "the court did consider the defective papers in opposition to this motion in ruling herein and deems them additional reasons to grant this motion." While not entirely clear, the court appeared to say that, even considering Saavedra's defective opposition, he did not meet his burden to demonstrate triable issues of fact. We think it is reasonably clear, however, that the court declined to impose the ultimate sanction of termination on the sole basis of Saavedra's procedural defects in the opposition papers.[7]

We decline to affirm on the ground that Saavedra's opposition papers were fatally defective, where it does not appear that the trial court did so.[8]

---

[7] We do not suggest that a court may not sanction noncompliant pleadings as appropriate to the circumstances. " 'Separate statements are required not to satisfy a sadistic urge to torment lawyers, but rather to afford due process to opposing parties and to permit trial courts to expeditiously review complex motions for . . . summary judgment to determine quickly and efficiently whether material facts are disputed,' " as well as which facts are contended to be material to each issue raised in the motion. (*Parkview Villas Assn., Inc. v. State Farm Fire & Casualty Co., supra,* 133 Cal.App.4th at p. 1210.) However, "granting a motion for summary judgment based on a procedural error by the opposing party is equivalent to a sanction terminating the action in favor of the other party. . . . [¶] Sanctions which have the effect of granting judgment to the other party on purely procedural grounds are disfavored. [Citations.] Terminating sanctions have been held to be an abuse of discretion unless the party's violation of the rule was willful [citations], or, if not willful, at least preceded by a history of abuse of pretrial procedures, or a showing less severe sanctions would not produce compliance with the procedural rule." (*Security Pacific Nat. Bank v. Bradley* (1992) 4 Cal.App.4th 89, 97–98, fn. omitted.)

[8] We note that Saavedra, who is represented on appeal by his trial counsel, continues to violate court rules. Most notably, few factual representations in his opening brief are supported with citations to the record. (Rule 8.204(a)(1)(C); see *Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115 [appellate court may treat as waived any factual contentions not supported by a citation to the record].) On some issues, he also fails to support arguments with legal authority applied to the particular

11

B.      *Failure to Exhaust Administrative and Judicial Remedies*

As to all of Saavedra's causes of action, the trial court granted summary judgment in part because Saavedra "failed to exhaust his administrative and judicial remedies." We agree with Saavedra that the court erred in this respect. The trial court apparently viewed the April 2010 *Skelly* hearing[9] followed by the union grievance procedure as an administrative remedy that Saavedra began and failed to complete.[10] FEHA claims are not barred either by a litigant's failure to exhaust union grievance remedies or by adverse results of such a grievance procedure.

1.      *Background*

On March 15, 2010, the City sent Saavedra the Notice of Intent to Terminate. The notice advised Saavedra of his right to respond to the charges in writing or at a *Skelly* hearing or both. A *Skelly* hearing took place on April 1. On April 28, Danziger recommended imposition of a 20-day suspension in lieu of termination. After further investigation, the City issued a notice of suspension on July 30, and Saavedra served the suspension in August and September.

---

facts of his case with any specificity. (See *id.* at pp. 1115–1116 [appellate court may deny claim on appeal that is unsupported by legal argument applying legal principles to the particular facts of the case on appeal].) Rule 8.276(a)(4) permits us to impose sanctions on a party or an attorney for committing any "unreasonable violation" of the rules of court. We issued a separate order requiring Saavedra and his counsel to show cause why they should not be sanctioned by this court for violating the aforementioned appellate court rules. We address the imposition of sanctions by separate order filed concurrently herewith.

[9] Due process requires that a permanent civil service employee be accorded certain procedural rights before disciplinary removal, including notice of the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the right to respond, either orally or in writing, to the authority initially imposing discipline—a full evidentiary hearing is not required. (*Skelly, supra,* 15 Cal.3d at pp. 213–215.)

[10] The trial court wrote, "The evidence shows that plaintiff Saavedra chose the [C]ity's internal grievance procedures except arbitration in which he could have presented evidence, taken testimony, cross-examined his accusers, etc. . . . Only following a negative finding by the *Skelly* Officer, Steve Danziger, did [Saavedra] change his mind about continuing the process and withdrew his request for arbitration."

12

On September 3, 2010, Saavedra's union filed a grievance contesting the suspension. A "Step 3" grievance meeting took place on November 3, 2010. The City then denied the grievance, finding "[t]here is substantial evidence that the suspension was for just cause." The grievance did not proceed to arbitration. Meanwhile, on July 11, 2010, Saavedra had filed discrimination complaints against the City, Minor, and Thomas with the Department of Fair Employment and Housing (DFEH), and DFEH closed all three cases the same day because Saavedra had requested an immediate right-to-sue notice. As noted *ante*, Saavedra filed this action in February 2011.

2.      *Analysis*

We review the trial court's legal rulings de novo and its factual findings for substantial evidence. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 800.)

"[The] exhaustion doctrine comes in two forms:  administrative and judicial. Administrative exhaustion refers to the requirement that a party initiate, and complete, a particular administrative proceeding before being permitted to proceed in court. The FEHA's administrative complaint procedure provides a clear example of one such administrative exhaustion requirement. . . . [¶] Judicial exhaustion is slightly different.  It may arise when a party initiates and takes to decision an administrative process—whether or not the party was required, as a matter of *administrative* exhaustion, to even begin the administrative process in the first place.  Once a decision has been issued, provided that decision is of a sufficiently judicial character to support collateral estoppel, respect for the administrative decisionmaking process requires that the prospective plaintiff continue that process to completion, including exhausting any available judicial avenues for reversal of adverse findings.  [Citation.]  Failure to do so will result in any quasi-judicial administrative findings achieving binding, preclusive effect and may bar further relief on the same claims." (*McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 113.)

" 'The underpinnings of [the] rule of exhaustion of judicial remedies are buried in the doctrine of res judicata or that portion of it known as collateral estoppel and more recently as issue preclusion. . . . [¶] . . . [¶] Res judicata . . . deals with the preclusive

13

effects of judgments in civil proceedings. . . . In its primary aspect the doctrine operates as a bar to the maintenance of a second suit between the same parties on the same cause of action.' [Citation.] Thus, if a party either participated in a quasi-judicial hearing, or was afforded the opportunity to do so as part of a mandatory administrative process, that process is considered her first 'suit,' and she is bound by its result. The exhaustion of judicial remedies rule provides she cannot pursue another remedy until she overturns the adverse result of the first suit." (*Ahmadi-Kashani v. Regents of University of California* (2008) 159 Cal.App.4th 449, 461 (*Ahmadi-Kashani*).)

The City cites *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074 (*Schifando*) and *Page v. Los Angeles County Probation Dept.* (2004) 123 Cal.App.4th 1135 (*Page*) in support of its position that Saavedra's FEHA claims were barred by his failure to exhaust internal administrative remedies. *Schifando* and *Page*, in turn, discuss the Supreme Court's earlier precedent regarding this issue (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61 (*Johnson*)).

In *Johnson,* the plaintiff filed a grievance with the City of Loma Linda after termination from his position as an assistant city manager. His grievance was rejected by the city personnel board, and the city council upheld that decision. The plaintiff then filed a discrimination claim with the DFEH and a discrimination suit in superior court. The trial court granted summary judgment for the City of Loma Linda in part on the basis that the plaintiff had failed to exhaust his judicial remedies. (*Johnson, supra,* 24 Cal.4th at pp. 66–67.) The Supreme Court affirmed, holding that when "a public employee pursues administrative civil service remedies, receives an adverse finding, and fails to have the finding set aside through judicial review procedures, the adverse finding is binding on discrimination claims under the FEHA." (*Id.* at p. 76.) *Johnson* made clear that the rule applies only to *quasi-judicial* administrative remedies. (*Id.* at pp. 65, 70.) *Johnson* also discussed the distinction between the exhaustion of judicial and administrative remedies. "Exhaustion of *administrative* remedies is 'a jurisdictional prerequisite to resort to the courts.' [Citation.] Exhaustion of *judicial* remedies, on the other hand, is necessary to avoid giving binding 'effect to the administrative agency's

14

decision, because that decision has achieved finality due to the aggrieved party's failure to pursue the exclusive *judicial* remedy for reviewing administrative action.' " (*Johnson*, at p. 70.)

In *Schifando,* the plaintiff filed suit against the City of Los Angeles alleging employment discrimination based on physical disability under the FEHA. The trial court sustained a demurrer to the complaint on the ground that the plaintiff had failed to file a timely administrative complaint as provided under the city charter. (*Schifando, supra,* 31 Cal.4th at p. 1080.) The Supreme Court reversed, holding that the primary intent of FEHA is to provide both public and private employees the opportunity to vindicate civil rights, and that public employee plaintiffs have a choice between their civil service remedies and those provided by the FEHA. (*Id.* at pp. 1087–1088.) "The benefits of judicial economy, agency expertise, and potential for swift resolution of grievances are better served by a rule that allows aggrieved public employees to seek redress in the forum that is most appropriate to their situation." (*Id.* at p. 1089.) The court explained that its holding was not in conflict with *Johnson*, ensuring "employees who choose to utilize internal procedures are not given a second 'bite of the procedural apple.' " (*Id.* at pp. 1090–1091.)

The *Page* court applied *Johnson* and *Schifando* to hold that an employee's FEHA action was barred because she elected to present her claims to a civil service commission that held a quasi-judicial hearing, she received adverse findings, and she failed to overturn those findings on judicial review of the administrative decision. (*Page, supra,* 123 Cal.App.4th at pp. 1142–1143.) As *Page* explains, if the public employee had an evidentiary hearing during the civil service proceedings, the employee may not opt out of those proceedings before a final decision is reached in order to file an FEHA claim in court. (*Ibid.*)

*Johnson*, *Schifando*, and *Page* have no application here. First, Saavedra did not elect a civil service remedy for his suspension. The *Skelly* hearing Saavedra received was a predisciplinary hearing mandated by procedural due process (*Skelly, supra,* 15 Cal.3d at

15

p. 215).[11]  Although such a hearing involves factual investigation and resolution of conflicting evidence, it is questionable whether the proceedings were sufficiently "quasi-judicial" to require pursuit of writ relief.[12]  The union grievance was not a civil service remedy (and in any event did not culminate in a quasi-judicial hearing, as no arbitration was ever held).  Second, and more importantly, while Saavedra challenged the factual bases asserted for disciplinary action, he presented no FEHA claims at either the *Skelly* hearing or in his union grievance, and it is not at all clear that he could have done so, at least in the grievance process.  The memorandum of understanding (MOU) between the City and Saavedra's union defines a "grievance" as "any dispute that involves the

_____

[11] The City represents on appeal that Saavedra "challenged the [20]-day suspension through the procedures set forth by the Civil Service Board Personnel Manual, which provides that the employee must be given the reasons for the suspension, and the employee has the right of hearing and investigation."  In support of this statement, the City first cites to section 10.02 of its April 2008 personnel manual, which is entitled "Procedure in Disciplinary Actions" and discusses the steps that may be taken to challenge a suspension after it is imposed.  The City also cites to a 1989 memo entitled "Employee Discipline – Due Process Requirements" that discusses how to comply with *Skelly, supra,* 15 Cal.3d 194, *before* imposing discipline.  Neither logic nor any evidence in the record supports the City's suggestion that the hearing referenced in section 10.02 of the personnel manual is the *Skelly* hearing referenced in the 1989 memo.  Moreover, there is no evidence that Saavedra took any steps to pursue his civil service remedies with respect to his suspension.

[12] Consideration of whether to give administrative findings preclusive effect requires examination of factors that would indicate the administrative proceeding was judicial in character.  These factors "include a hearing before an impartial decision maker; testimony given under oath or affirmation; a party's ability to subpoena, call, examine, and cross-examine witnesses, to introduce documentary evidence, and to make oral and written argument; the taking of a record of the proceeding; and a written statement of reasons for the decision."  (*Pacific Lumber Co. v. State Water Resources Control Bd.* (2006) 37 Cal.4th 921, 944.)  Even if sufficiently "judicial" in nature, the issues presented to *Skelly* officer Danziger significantly differed.  "[C]ase law recognizes two rights or interests at stake when a civil service employee challenges discipline or termination on discriminatory or retaliatory grounds.  The primary right protected by the state civil service system is the right to continued employment, while the primary right protected by FEHA is the right to be free from invidious discrimination and from retaliation for opposing discrimination."  (*George v. California Unemployment Ins. Appeals Bd.* (2009) 179 Cal.App.4th 1475, 1483.)

16

interpretation or application of this agreement." While the MOU generally prohibits "discrimination" by either the City or the union, the City, in its denial of Saavedra's Step 3 grievance, expressly asserted that "State and Federal statutes . . . are not gr[ie]vable." Saavedra cites his suspension in his civil complaint as one act of retaliation by the City, but his FEHA claims encompass a litany of purported discriminatory and retaliatory actions by his supervisors and by the City, none of which were addressed in any administrative proceeding.

Union grievance procedures are distinguishable from civil service administrative proceedings in several important respects, and do not eliminate the right to a jury determination of important state statutory rights afforded to individual workers under FEHA unless two conditions are met. "First, we believe that if the FEHA claims of a union member are to be finally resolved by arbitration (with the concomitant loss of a jury of one's peers), the agreement to do so in a [collective bargaining agreement] must be 'clear and unmistakable.' [Citations.] . . . [¶] Second, the procedures of the arbitration must allow for the full litigation and fair adjudication of the FEHA claim." (*Camargo v. California Portland Cement Co.* (2001) 86 Cal.App.4th 995, 1018, fn. omitted (*Camargo*); see *Wright v. Universal Maritime Service Corp.* (1998) 525 U.S. 70, 80 [waiver of an employee's right to have employment discrimination claims heard in a judicial forum must be " 'clear and unmistakable' "; intent to waive statutorily protected right to a judicial forum must be " ' "explicitly stated" ' "]; *Ortega v. Contra Costa Community College Dist.* (2007) 156 Cal.App.4th 1073, 1085–1086 (*Ortega*); *Marcario v. County of Orange* (2007) 155 Cal.App.4th 397, 399, 406 [distinguishing binding effect of findings made in union grievance procedures from those made in quasi-judicial administrative proceedings].)

The union MOU here contains a general prohibition against discrimination, but says nothing directly about grievance of such claims. It certainly does not explicitly provide for arbitration of FEHA claims, nor does it reflect any clear and unmistakable intent to waive an employee's right to resort to a judicial forum. " ' "In the collective bargaining context, the parties 'must be particularly clear' about their intent to arbitrate

statutory discrimination claims." . . . A simple agreement not to engage in acts violative of a particular statute will not suffice; the agreement must establish the intent of the parties to incorporate "in their entirety" the discrimination statutes.' " (*Mendez v. Mid-Wilshire Health Care Center* (2013) 220 Cal.App.4th 534, 544.) Moreover, "as in *Camargo,* the record in this case 'sheds little light on the fairness of the [factfinding procedure], on the extent of discovery that was allowed the parties, or on whether the [factfinders] had any special competence in the adjudication of FEHA claims.' " (*Ortega, supra*, 156 Cal.App.4th at p. 1085.) Thus, the second requirement of *Camargo* has likewise not been met.

Had Saavedra pursued arbitration under the MOU, any decision would consequently not have had collateral estoppel effect. Therefore, an employee's use of the grievance procedure prior to arbitration stage could have no collateral estoppel effect. (See *Ahmadi-Kashani, supra,* 159 Cal.App.4th at p. 452 ["[w]e perceive no basis for according binding effect to a partially completed grievance process, when even the completed process would not have been entitled to such effect"].)[13] Saavedra's utilization of the grievance process under the MOU does not bar his state court FEHA actions against the City.[14] Saavedra alleged that he timely filed a complaint with the DFEH, and this is sufficient to plead exhaustion. (*Ortega, supra*, 156 Cal.App.4th at p. 1086.)

The City does not raise (and did not raise in the trial court) any independent basis for dismissal of Saavedra's non-FEHA claims on the grounds of failure to exhaust administrative or judicial remedies. Any such argument is therefore forfeited. (See *Ward*

---

[13] *Ahmadi-Kashani* also held that collateral estoppel did not apply because the initial union grievance steps the employee completed were not quasi-judicial hearings that justified application of the rule established by *Johnson, supra,* 24 Cal.4th 61. (*Ahmadi-Kashani, supra,* 159 Cal.App.4th at pp. 457–459.) Because the plaintiff was pursuing a union grievance procedure rather than a civil service remedy (or other internal administrative remedy), this analysis was unnecessary.

[14] At oral argument, the City appeared to concede that arbitration under the MOU grievance procedures was not required, but argued that Saavedra was nevertheless required to challenge the *Skelly* findings through civil service appeal.

*v. Taggart* (1959) 51 Cal.2d 736, 742; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785.)

In sum, we reverse the trial court's rulings based on failure to exhaust administrative or judicial remedies.

C.       *Failure to Raise Triable Issues of Fact*

Summary judgment is appropriate "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)  "[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 850, fn. omitted.)  "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Ibid.*, fn. omitted.)  When the plaintiff bears the burden of proving facts by a preponderance of the evidence and the defendant moves for summary judgment, the defendant "must present evidence that would require a reasonable trier of fact *not* to find any underlying material fact more likely than not." (*Id.* at p. 851.)  In ruling on the motion, the court must draw all reasonable inferences from the evidence in the light most favorable to the opposing party. (*Id.* at p. 843.)  We review an order granting summary judgment de novo. (*Id.* at p. 860.)

1.       *Saavedra's Discrimination, Harassment, Retaliation, and Hostile Work Environment Claims*

The trial court granted summary judgment as to the claims for discrimination and retaliation in part because "the undisputed evidence shows that incidents that [Saavedra] complains of do not constitute adverse employment actions to support a prima facie case" of discrimination or retaliation.  The trial court also ruled that the "undisputed evidence shows that there was no severe or pervasive harassment [or hostile work environment]."  Saavedra argues these rulings were error.  We agree the court erred.

19

a. *Adverse Action, Harassment, and Hostile Work Environment*

The anti-discrimination and anti-retaliation provisions of FEHA prohibit the same forms of adverse action, namely conduct that materially affects the terms and conditions of employment. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1050–1051 & fn. 9 (*Yanowitz*).) Such adverse action "is not limited to adverse employment actions that impose an economic detriment or inflict a tangible psychological injury upon an employee" (*id.* at p. 1052), or to "so-called ultimate employment actions such as termination or demotion" (*id.* at p. 1054). Adverse action includes "the entire spectrum of employment actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement in his or her career" except for "[m]inor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee." (*Ibid.*) The statutory language "must be interpreted liberally and with a reasonable appreciation of the realities of the workplace in order to afford employees the appropriate and generous protection against employment discrimination [and retaliation] that the FEHA was intended to provide." (*Ibid.*, fn. omitted.)

When considering whether an employee has been subjected to actionable discrimination or retaliation, courts should consider the employer's entire course of conduct rather than each separate alleged adverse act. "[T]here is no requirement that an employer's retaliatory [or discriminatory] acts constitute one swift blow, rather than a series of subtle, yet damaging, injuries." (*Yanowitz, supra,* 36 Cal.4th at p. 1055; *id.* at p. 1056.) Further, under "the continuing violation doctrine," acts that fall outside the FEHA limitations period (generally, one year) may be considered if " 'the employer's . . . actions [were] (1) sufficiently similar in kind—recognizing, as this case illustrates, that similar kinds of unlawful employer conduct, such as acts of harassment or failures to reasonably accommodate disability, may take a number of different forms [citation]; (2) have occurred with reasonable frequency; (3) and have not acquired a degree of

20

permanence.' " (*Id.* at p. 1059, fn. omitted; see § 12960, subd. (d) [FEHA limitations period].)

The evidence would support an inference that Thomas subjected Saavedra to a continuing course of adverse treatment following Saavedra's transfer to the Civic Center Complex. The conduct included requiring Saavedra to perform African-American custodians' work for no extra pay while they took unauthorized or lengthy breaks, requiring him to perform disfavored tasks when African-American custodians refused to do the work, and subjecting him to a harassing environment where he was singled out for criticism. Requiring Saavedra to perform extra work for no additional pay resulted in pecuniary harm. Blatant disparate treatment in the assignment of workload and disfavored work duties and singling out Saavedra for criticism is nontrivial conduct that could adversely affect his job performance.

The evidence further would support an inference that Minor, Thomas and other custodial staff subjected Saavedra to a continuing course of actionable adverse treatment from the time Saavedra complained about Thomas's discriminatory behavior. The conduct included Minor's and Thomas's acts and statements that contributed to imposition of the 20-day suspension, transfers to 150 Plaza and OPD over Saavedra's objections, mistreatment at OPD, and denials of promotions. The suspension and denials of promotions led directly to pecuniary harm. The transfer to 150 Plaza was disparate treatment (the transfer was made to protect Couch from discipline) that contributed to a nontrivial atmosphere of discrimination in Saavedra's workplace. The transfer to and mistreatment at OPD could be found to rise to the level of harassment. In *Yanowitz*, the Supreme Court held that an employer's "heightened response to [a complainant's] allegedly poor performance" was actionable retaliatory harassment, even in the absence of adverse official actions. (*Yanowitz, supra,* 36 Cal.4th at p. 1062.) A supervisor with a motive to retaliate subjected Yanowitz to disciplinary actions and threats of termination on the basis of conduct that had previously been noted in her performance reviews when she nevertheless received favorable performance ratings and was named sales manager of the year. The supervisor further berated Yanowitz in the presence of her staff and

21

actively solicited negative information about her performance. (*Id.* at p. 1061–1062.) Here, Saavedra has produced evidence that Minor singled him out to be escorted for the fingerprinting process when he was first transferred to OPD, and that Bowles solicited negative information about Saavedra from Ratliff and "Ricky" and actively tried to discipline or layoff Saavedra on unjustified grounds while he was at OPD. This evidence raises a triable issue about whether Saavedra was subjected to unlawful harassment.

As to alleged adverse actions that occurred *before* Saavedra's transfer to the Civic Center Complex in 2008 (denial of reimbursements for work use of his personal car and denial of a promotion), Saavedra has not produced evidence supporting an inference that the actions were part of a continuing course of conduct that continued into the limitations period. For example, he does not attribute the actions to Minor or Thomas. However, summary adjudication "shall be granted only if it completely disposes of a cause of action." (Code Civ. Proc., § 437c, subd. (f)(1).) We hold the trial court's order is not supported by its ruling that Saavedra failed to raise triable issues of fact regarding adverse action, harassment or a hostile working environment.

### b. *Discriminatory or Retaliatory Motive*

The trial court ruled that the City "successfully offered evidence of a non-discriminatory reason for [any adverse] actions, and [Saavedra] failed to show that such reasons were really pretext." The trial court also ruled that the "undisputed evidence . . . shows that there is no causal link between any protected activity and any adverse employment action."[15] Saavedra argues these rulings were error. We agree the trial court erred.

To establish a prima facie case of discrimination under FEHA, "[g]enerally, the plaintiff must provide evidence that (1) he was a member of a protected class, (2) he was

---

[15] The trial court ruled that Saavedra's retaliation "claim against the individual defendants Derin Minor and Dameion Thomas fails because retaliation claims cannot be maintained against individuals." On appeal, Saavedra does not challenge this ruling, which is supported by *Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1173.

qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355.) The prima facie case gives rise to a rebuttable presumption of discrimination. The burden then shifts to the employer to produce admissible evidence that its action was taken for a legitimate, nondiscriminatory reason. If the employer makes this showing, the presumption disappears and the plaintiff must show that the employer's reasons for the action were a pretext for discrimination or offer other evidence of discriminatory motive. (*Id.* at pp. 355–356.)

"[T]o establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz, supra,* 36 Cal.4th at p. 1042.) " ' "The causal link may be established by an inference derived from circumstantial evidence, 'such as the employer's knowledge that the [employee] engaged in protected activities and the proximity in time between the protected action and allegedly retaliatory employment decision.' " ' " (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 69.) "Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. [Citation.] If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation ' " 'drops out of the picture,' " ' and the burden shifts back to the employee to prove intentional retaliation." (*Yanowitz*, at p. 1042.)

With respect to the adverse treatment Saavedra suffered during his assignment at Civic Center Complex (requiring Saavedra to perform African-American custodians' work for no extra pay while they took unauthorized or lengthy breaks or refused to do the work, and subjecting him to a harassing environment where he was singled out for criticism), Saavedra established a prima facie case of discrimination because he describes

23

disparate treatment on the basis of race.[16]  The City disputes the allegations, but does not provide any race-neutral reasons for any of the disparate treatment described in this paragraph.  Therefore, triable issues of fact remain regarding Saavedra's claims of discrimination following his initial transfer to the Civic Center Complex.

With respect to the suspension, Saavedra has raised a prima facie case of retaliation at least with respect to two of the three grounds for the discipline.  Saavedra produced evidence that in 2008 he complained to Minor and Thomas about discriminatory treatment by Thomas.  In response to the complaints, Thomas became angry with Saavedra, Minor told Saavedra not to talk back to Thomas, and Minor became less friendly toward Saavedra.  Relatively soon thereafter[17] Saavedra was reassigned to 150 Plaza over his objection.  Soon thereafter, Thomas purportedly told Saavedra to leave preexisting pornographic magazines in the eighth-floor custodial closet and within the next few months he gave Saavedra permission to use the DIT closet.  After Saavedra came under suspicion of misconduct for possessing pornography and using the DIT room without authorization, Thomas denied having given him permission to do those things.  In March 2009, Minor referred Saavedra for discipline for the misconduct based in part on Thomas's denials.  The temporal nexus between Thomas's negative reaction to Saavedra's complaints and Thomas's alleged lies is sufficient to support a claim for

---

[16] Saavedra's claim that he was required to perform eight hours of work in seven hours and for seven hours' pay appears to be related to, but additional to, his claims that he was denied promotions to a full-time position.  It appears that permanent part-time custodians have a seven-hour-a-day schedule and permanent full-time custodians have an eight-hour-a-day schedule, and Saavedra claims not only that he was denied a promotion on the basis of race or retaliation, but also that he was assigned to positions that had been staffed by full-time custodians and was expected to perform the same amount of work for less pay.  In the case of his assignment to Couch's former eight-hour position at 150 Plaza, Saavedra claims the lower pay was racially discriminatory.  Drawing all reasonable inferences in Saavedra's favor, we infer that he makes the same claim with respect to his initial assignment at the Civic Center Complex for a seven-hour schedule in a formerly eight-hour position.

[17] Saavedra was first transferred to the Civic Center Complex in May 2008, he complained sometime thereafter, and he was reassigned to 150 Plaza in November 2008.

retaliation. Alternatively, based on Thomas's other discriminatory behavior toward Saavedra in the assignment of work duties, a reasonable juror could infer that Thomas acted with discriminatory intent in making false denials. With respect to Minor, a reasonable juror could infer that he acted with a discriminatory or retaliatory motive in referring the matter for discipline, as Saavedra submitted evidence Minor likely knew the magazines had been in the closet before Saavedra's transfer and Minor failed to investigate anyone other than Saavedra who had access to the closet.

Regarding Saavedra's transfer back to Edgewater in 2010 and delay in reimbursement for work use of his personal car during that assignment, Saavedra may have raised a prima facie case of discrimination or retaliation by Minor in light of Minor's prior treatment of Saavedra. However, Saavedra has not identified adverse action resulting from the transfer other than the delay in reimbursement, and the City produced evidence that the delay was due to slow processing of paperwork in the fiscal office rather than to any act by Minor, who promptly submitted Saavedra's paperwork. Saavedra's bare assertion that "Minor delayed payment" of the reimbursement is insufficient to raise a triable issue of fact on this issue.[18]

Regarding Saavedra's transfer to and mistreatment at OPD, Saavedra has raised a prima facie case of retaliation. In addition to Saavedra's initial complaints about Thomas's alleged discrimination, Saavedra had by this time complained about his transfers to 150 Plaza, Edgewater, OPD, as well as the 2009 investigation and 2010 suspension. During his assignment at OPD, Saavedra additionally complained about his mistreatment there and to the reference to his approved 2009 family leave in a 2011 performance review. The temporal nexus between these complaints and the mistreatment support an inference of retaliatory intent. Moreover, because most of the mistreatment (including heightened scrutiny, attempted discipline and layoff, and an unfavorable comment in an initial draft of a performance review) occurred after Saavedra

_____

[18] Saavedra cited to pages 236 to 237 of Minor's deposition in support of this claim, but those pages of the deposition are not in the record.

25

had served his suspension, a reasonable juror could infer that the course of conduct was a retaliatory attempt to get rid of Saavedra after a failed attempt to have his employment terminated. Alternatively, a reasonable juror could conclude the mistreatment was racial discrimination because Saavedra testified he was singled out by race to be escorted to the background check, and because he was placed in a full-time position formerly held by an African-American and required to do the work on a part-time schedule. A reasonable juror could also attribute the mistreatment to Minor based on evidence that Minor previously retaliated or discriminated against Saavedra, Minor was directly responsible for some of the mistreatment at OPD (background check escort and performance evaluation comment), and the remainder of the treatment was carried out by Minor's subordinates who had no other apparent motive to mistreat Saavedra. The City does not provide neutral reasons of any of the alleged mistreatment at OPD. Therefore, triable issues of fact remain about whether his treatment at OPD was retaliatory or discriminatory.

With respect to promotion denials, the City produced evidence that Saavedra interviewed for a full-time position twice between 2009 and 2013 and Minor hired two Hispanics and one African-American for those positions. This evidence suggests that Saavedra failed to make a prima facie case of discrimination on this issue. Saavedra, however, produced evidence that he was passed over for a promotion in July 2009 when the job went to an African-American with less seniority, and on another occasion when the job went to a White external candidate. Disputes in the evidence must be resolved in Saavedra's favor on summary judgment. Saavedra's evidence is sufficient to establish a prima facie case and the City has not produced evidence of nondiscriminatory reasons for the promotion decisions Saavedra describes. Therefore, triable issues of fact exist as to these claims.

In sum, the trial court erred in granting summary adjudication of Saavedra's claims for discrimination, retaliation, harassment and hostile work environment, except for the retaliation claim against the individual defendants. Although we agree that Saavedra failed to raise a triable issue about whether the delay in reimbursements for

26

work use of his personal vehicle in 2010 was discriminatory or retaliatory, summary adjudication "shall be granted only if it completely disposes of a cause of action." (Code Civ. Proc., § 437c, subd. (f)(1).) Therefore, we reverse summary adjudication of the aforementioned claims.

2. *Saavedra's Tort and Labor Code Claims*

The trial court ruled that the non-FEHA claims for wrongful discipline, defamation[19] and violation of Labor Code section 1102.5 were time-barred pursuant to the Government Claims Act (Gov. Code, § 810 et seq.; *id.,* § 945.6.) Saavedra argues the court erred in holding these claims were time-barred. We agree with the trial court.

All claims for money or damages against a local public entity, with exceptions not relevant here, must be presented to the entity within six months of accrual of the cause of action. (Gov. Code, §§ 905, 910, 911.2) If the entity rejects the claim with a prescribed form of statutory notice (*Id.*, § 913), the claimant may sue in court no later than six months after the date such notice is personally delivered or deposited in the mail (again, with exceptions not relevant here). (*Id.*, §§ 945.4, 945.6.) The six-month limitation period expires six calendar months or 182 days after the date the notice was sent, whichever is later. (*Gonzales v. County of Los Angeles* (1988) 199 Cal.App.3d 601, 603.)

Saavedra sent the City a "Notice of Tort Claim for Damages" in July 2010. The City sent the prescribed statutory notice denying the claim on August 3, 2010. Six calendar months after that date was February 3, 2011. One hundred eighty-two days after

---

[19] Although the defamation claim was brought against the individual defendants only, the government claim requirement still applied. Government Code section 950.2 provides, with exceptions not relevant here, that "a cause of action against a public employee . . . for injury resulting from an act or omission in the scope of his employment as a public employee is barred if an action against the employing public entity for such injury is barred . . . under Chapter 2 (commencing with Section 945) of Part 4 of this division." Because a defamation claim by Saavedra against the City is barred by Government Code section 945.6, his claim against the individual defendants is also barred. (See *Neal v. Gatlin* (1973) 35 Cal.App.3d 871, 876–878 [Gov. Code, § 950.2 applies to alleged defamatory evaluations by members of public college tenure committee].)

27

August 3, 2010, was February 1, 2011. Saavedra filed his complaint on February 4, 2011. The complaint was untimely with respect to the tort and Labor Code claims.

Saavedra makes no argument with respect to the Government Claims Act, but instead insists that all three claims were timely with respect to their underlying limitations periods. However, " '[s]uits against a public entity are governed by the specific statute of limitations provided in the Government Code, rather than the statute of limitations which applies to private defendants.' " (*Martell v. Antelope Valley Hospital Medical Center* (1998) 67 Cal.App.4th 978, 981.) We affirm the trial court's timeliness rulings with respect to the tort and Labor Code claims.

## III.   DISPOSITION

The judgment and order granting summary judgment are reversed in part. Summary adjudication of Saavedra's claims for violation of Labor Code section 1102.5, wrongful discipline, and defamation is affirmed. Summary adjudication of the claim for retaliation is affirmed as to the individual defendants and reversed as to the City of Oakland. Summary adjudication of all other claims is reversed.

Each side shall bear its own costs.

28

_____
BRUINIERS, J.

WE CONCUR:


_____
JONES, P. J.


_____
NEEDHAM, J.

A142088