Filed 9/9/22

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| STEVEN RODGERS,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>STATE PERSONNEL BOARD,<br><br>    Defendant and Respondent;<br><br>DEPARTMENT OF CORRECTIONS AND REHABILITATION,<br><br>    Real Party in Interest and<br>    Respondent. | E075803<br><br>(Super.Ct.No. CIVDS1921826)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County. Donald R. Alvarez, Judge. Reversed with directions.

Castillo Harper, Brandi L. Harper, and Michael A. Morguess for Plaintiff and Appellant.

No appearance for Defendant and Respondent, State Personnel Board.

Department of Corrections and Rehabilitation and Leslie Wagley for Respondent and Real Party in Interest.

Steven Rodgers is a correctional sergeant employed by the Department of Corrections and Rehabilitation (CDCR). He appeals the denial of his writ petition seeking to set aside the State Personnel Board's (SPB) decision to reduce his salary by 10 percent for two years as a penalty for an incident that occurred in July 2017 while he was supervising a contraband surveillance watch shift at Pelican Bay State Prison.

Rodgers argues the factual findings the SPB adopted after his administrative hearing are (i) not supported by substantial evidence and (ii) significantly different from those alleged in the notice of adverse action (NOAA), and as a result, SPB's decision violated his due process right to notice of the charges against him. We agree with his second contention and therefore reverse.

**I**

**FACTS**

A. *Contraband Surveillance Watch*

Contraband surveillance watch is a procedure for monitoring inmates suspected of hiding drugs or weapons inside their body. The inmate is physically restrained and placed in an isolated cell under constant, one-on-one observation until they excrete the contraband (or until 72 hours have elapsed, at which point special approval is needed to extend the procedure). The physical restraints are designed to prevent the inmate from accessing and re-ingesting the contraband before staff has a chance to retrieve it. They

2

consist of leg irons and handcuffs that connect to a waistband, and a "hand isolation device" resembling a mitten that attaches to the handcuffs. The leg irons and handcuffs are equipped with a double-locking mechanism that keeps the restraint secure and prevents it from becoming too tight and cutting off the inmate's circulation when manipulated.

Each watch is divided into shifts and every shift is supervised by a sergeant. There is one officer assigned to each inmate under surveillance. Every 15 minutes, the officer must perform a wellness check of their inmate and record their observations on their watch form. The officer must also periodically check the temperature of the cell.

At least twice during each shift, the supervising sergeant must help the officer conduct a restraint check, which is a physical inspection of the inmate's restraints to ensure they are both secure and comfortable. Pelican Bay's contraband surveillance watch policy states the restraint checks must occur "at a minimum twice per shift" and "preferably at the beginning and then again at the end of the shift." Every restraint check must be documented on the watch form and signed by the supervising sergeant.

B. *The Notice of Adverse Action*

Rodgers has worked for CDCR since November 2008 and has served as a correctional sergeant since 2014. In early May 2018, CDCR served him with an NOAA stating they were reducing his salary by 10 percent for two years, effective the end of that month. CDCR alleged that while supervising a contraband surveillance watch shift Rodgers refused to perform a restraint check at the beginning of the shift and directed his

3

officers to falsify the watch form to say they had performed the check. CDCR also alleged that when Rodgers found out the officers had reported his misconduct to another sergeant, he angrily confronted them and used profanity in asking them who had ratted him out.

CDCR alleged the following factual basis to support their proposed penalty. On the evening of July 22, 2017, correctional officers Angulo and Palafox reported to the "C facility" of Pelican Bay's Security Housing Unit (SHU) for their contraband surveillance watch shift, which started at 10:00 p.m. and ended at 6:00 a.m. the following day. The officers began reviewing their documentation packets for their shift, which included the watch form for their inmate and a copy of CDCR's contraband surveillance watch procedures.

Shortly after the shift began, they asked Rodgers to conduct the restraint check and he told them he was "too busy." At about 10:30 p.m., Palafox found Rodgers in the C Facility Program Office, and asked him to do the restraint check. Rodgers told Palafox to "pencil whip" (a military term that means forge or falsify) the form to say they completed the inspection, and if anything happened, he'd "take the hit."

When Palafox told Angulo what had happened, they became uncomfortable with the idea of not doing the inspection and falsifying the form. Angulo contacted Sergeant Moore, who was on duty in a different area, for advice. Moore told him inspections were mandatory and one must be done at the beginning of the shift. Moore then contacted

4

Rodgers's supervisor, Lieutenant Vanderhoofven, and informed him that Rodgers was "refusing to perform the inmate restraint checks at the beginning of the shift as required."

At about 11:15 p.m., Angulo found Rodgers in his office and asked him to conduct the restraint check, at which point Rodgers became irritated with the officers for repeatedly asking about the inspection. It wasn't until around midnight (two hours into the shift), Rodgers returned to the watch area and finally conducted the restraint check, during which they discovered one of the inmate's leg cuffs was not double-locked.

A couple hours after that, around 2:00 a.m., Vanderhoofven visited C Facility to discuss proper procedure with Rodgers. He told Rodgers that another sergeant had informed him of his refusal to inspect the restraints at the beginning of the shift. After Vanderhoofven left, Rodgers returned to the watch area and angrily asked the officers, "Which one of you mother fuckers spoke to another sergeant about this?" When Angulo responded that it had been him, Rodgers complained that he had received training as a result.

Due to the difficulties the officers had in getting Rodgers to inspect the restraints, when they saw Sergeant Reynoso arriving to take over as supervising sergeant for the next shift at 5:30 a.m., they asked him to do the inspection with them. When Rodgers arrived about 10 minutes later to do the final inspection and saw the officers had gotten another sergeant to do it, he became upset again and said, "What the hell, you trying to have another sergeant do my job?"

CDCR alleged Rodgers's conduct violated Government Code section 19572, subdivisions (d) (inexcusable neglect of duty); (m) (discourteous treatment); (o) (willful disobedience); and (t) (behavior either during or outside duty hours of such a nature to cause discredit to his employer). (Unlabeled statutory citations refer to this code.) Specifically, CDCR alleged that Rodgers had: (i) neglected his duties by "refusing to perform" the inspection at the beginning of shift; (ii) treated his subordinates in a "discourteous and disrespectful" manner when he angrily, and with profane language, "confronted and intimidated" them about reporting his neglect of duty to another sergeant; and (iii) "misused [his] authority" when he directed the officers to "pencil whip" their inspection documentation, thereby "instructing them to fill in inaccurate information regarding the restraint inspections on official records."

C. *The SPB's Decision*

Rodgers appealed his discipline to the SPB, and his administrative hearing took place before Administrative Law Judge (ALJ) John Johnson in November 2018. After hearing testimony from Rodgers, Palafox, Angulo, Moore, Reynoso, and Vanderhoofven, the ALJ issued a 25-page ruling with detailed credibility determinations and findings of facts.

The ALJ concluded CDCR had failed to prove that Rodgers had refused to perform the restraint check on time and directed his officers to falsify their watch forms. Instead, the ALJ found the following facts true.

On the evening of July 22, 2017, Rodgers met with Palafox and Angulo at the start of the shift. He briefly went over the contraband surveillance watch procedures with them, "reminding them to document everything and to use the proper terminology." Though he didn't perform the restraint check at that time, he told "Palafox and Angulo that he would return later to perform it."

About 15 minutes later (at approximately 10:15 p.m.), Palafox left his post to find Rodgers and ask him to perform the restraint check. Palafox found Rodgers at the corridor control booth where Rodgers was having the corridor control officer sign his time sheet. Rodgers told Palafox he was in the middle of completing other duties and would come back later to do the restraint check. He told Palafox to "pencil in" his portion of the watch form and "I'll come back later and, you know, we'll figure it out." Palafox responded, "Oh, okay," then he and Rodgers went to the watch area where Rodgers performed a quick visual wellness check on the inmates and signed the watch form noting he'd done so.

After Rodgers left, Palafox and Angulo began discussing the restraint check. Palafox considered the first 30 minutes to be the beginning of the shift; Angulo, the first hour. They were both aware that the prison closely scrutinized the watch forms as a result of inmate lawsuits alleging the conditions of contraband surveillance watch were inhumane, and they were worried Rodgers wasn't going to come back to do the inspection in a timely manner.

At approximately 10:25 p.m., Angulo called Moore and implied that Rodgers was refusing to do the restraint check. Moore told Angulo the inspections were mandatory and said she would "take care of it." She then called Rodgers's supervisor, Vanderhoofven, and told him Rodgers was refusing to do the restraint checks.

After his conversation with Moore, Angulo left his post to speak with Rodgers in his office. He asked Rodgers about the restraint checks, and Rodgers said he would do so later. Since the start of the shift, Rodgers had been busy with his other duties, which included ensuring that all the correctional officers under his supervision in C Facility (which that evening was about 30 people) had reported for duty, made it to their assigned posts, and signed in on their timesheets.

At approximately 10:45 p.m., Rodgers returned to the watch area and performed the restraint checks with the officers. They discovered one of the inmate's leg cuffs had not been double-locked and corrected the issue.

Around 2:00 a.m., Vanderhoofven went to C Facility to give Rodgers a mid-shift training on contraband surveillance watch procedures. He informed Rodgers that he was receiving the training because "another sergeant had called him and told him that [he] had not performed the restraints check when he should have." After the training session, Rodgers went to the watch area to ask the officers what had happened. He asked them in an "upset and angry" tone, "Which one of you mother fuckers spoke to another sergeant about this?" Angulo responded that he had, and Rodgers replied, in an "irritated" tone, "Great. Thanks a lot. Just great." He asked if they were trying to get him fired, then left.

At 5:30 a.m., Palafox and Angulo saw Reynoso arriving to supervise the next shift. Because they felt uncomfortable around Rodgers after their last interaction, they asked Reynoso if he would do the end-of-shift restraint checks with them. Ten minutes later, when Rodgers arrived to do the inspection and saw the officers had gotten Reynoso to do it, he said angrily, "You don't tell me how to do my job. I know how to do my job. You don't need to find other sergeants to do my job for me." He then performed another restraint check, signed the watch forms, and left.

In finding these facts to be true, the ALJ explained that he had largely credited Rodgers's testimony over the officers' testimony. Specifically, he found the allegation that Rodgers had refused to perform a timely restraint check at the beginning of the shift unsubstantiated. Instead, he credited Rodgers's testimony that he had repeatedly assured the officers that he was busy but would come by and do the inspections with them later. Additionally, the ALJ discredited Angulo's testimony that Rodgers didn't perform the first inspection until about two hours into the shift. Rather, he found Rodgers to be credible when he said he performed the restraint check 45 minutes into the shift, testimony that was corroborated by Palafox's watch form.

The ALJ also credited each witness's testimony about what they believed constituted the "beginning" of a shift and found the answers to range from the first 15 minutes to the first hour. Because Rodgers had performed the restraint check within that range—and because Pelican Bay's contraband surveillance watch procedures do not *require* restraint checks at the beginning or end of the shift nor do the procedures specify

9

what constitutes the beginning and end of a shift—he concluded Rodgers had not neglected his duties in this regard.

The ALJ also concluded the document falsification allegation was unsubstantiated. He discredited Palafox's testimony that Rodgers told him to "pencil whip" the form, finding instead that Rodgers had told him to "pencil in" his portion and that he (Rodgers) would come by later for the inspection.

Finally, as to the discourteous confrontation charge, the ALJ found Rodgers had been angry and used profanity as alleged in the NOAA, *but for a different reason than alleged in the NOAA*. He credited the officers' testimony that Rodgers had been angry and used profanity over Rodgers's testimony that he was simply curious about who had reported him and hadn't used profanity. In reaching this credibility determination, the ALJ noted that Vanderhoofven, "who otherwise liked and respected [Rodgers] and believed [him] to be a good sergeant, testified that [Rodgers] did not like to have his authority challenged, and appeared to be upset that someone had reported him when [he] came to train him." During their testimony, Moore and Vanderhoofven said they too would be upset if they were in Rodgers's position, though both agreed that expressing anger and using profanity in such situations is unprofessional and discourteous.

Weighing all the testimony on this issue, the ALJ found it unbelievable that Rodgers wouldn't be angry that one of his subordinates had reported him for refusing to perform the restraint check in a timely manner. Thus, he found Rodgers was angry because he believed the officers had inaccurately reported him for a neglect of duty he

10

had not committed—not because he believed the officers had accurately reported his intentional misconduct.

The ALJ concluded that Rodgers's angry confrontation and use of profanity toward the officers violated section 19572, subdivisions (d) (inexcusable neglect of duty), (m) (discourteous treatment), (o) (willful disobedience), and (t) (other discrediting behavior) because CDCR has a policy requiring employees to treat each other with respect and prohibiting the use of profanity while on duty. (Cal. Code Regs., tit. 15, § 3391, subd. (a).)[1] Finally, the ALJ concluded the full proposed salary reduction was an appropriate penalty for these violations.

The SPB adopted the ALJ's decision, and Rodgers filed a petition for rehearing with the SPB arguing the penalty was not supported by substantial evidence and was excessive based on the facts the ALJ found to be true. SPB denied the petition, and Rodgers filed a petition for writ of mandamus under Code of Civil Procedure section 1094.5 in the superior court raising the same arguments. The superior court denied Rodgers's petition, and Rodgers appealed.

## II

## ANALYSIS

Rodgers argues the SPB's decision "violates due process [because he] was not notified that he was to be disciplined with a ten percent reduction in salary for two years

---

[1] This regulation states in relevant part: "Employees shall be alert, courteous, and professional in their dealings with inmates, parolees, fellow employees, visitors and members of the public. . . . Employees shall not use indecent, abusive, profane, or otherwise improper language while on duty." (Cal. Code Regs., tit. 15, § 3391, subd. (a).)

11

based on a single allegation of misconduct." We agree with Rodgers. Because the ALJ found he engaged in significantly different conduct than that alleged in the NOAA, we conclude he lacked notice such conduct could subject him to the full penalty proposed in the NOAA.

A. *Generally Applicable Legal Principles*

The procedure by which a permanent state employee may be dismissed or otherwise disciplined is described in sections 19574 through 19588. The employer, in this case CDCR, must first determine whether there is cause for discipline and, if so, what discipline to impose. (§ 19574.) To comply with due process, the employer must give the employee notice of and reasons for the proposed disciplinary action and give the employee an opportunity to respond. (*Ibid.*; *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194, 215 (*Skelly*).)

"Due Process requires that [an employee] be given 'notice . . . of the standards by which his conduct is to be measured' [citation] and 'fair notice as to the reach of the [disciplinary] procedure.' [Citation.] That requires that the respondent be given adequate notice both of the claimed legal standard and the events which are alleged to contravene it and an opportunity to challenge them. Where the cause alleged has potential application to a broad range of conduct, such as unprofessional conduct, the events alleged to contravene the charge do more than allege what must be proved. They also provide criteria by which the charge is narrowed." (*Brown v. State Personnel Bd.* (1985) 166 Cal.App.3d 1151, 1164, fn. 5 (*Brown*).)

12

Except in cases involving minor disciplinary matters, the employee has a right to challenge the action at an evidentiary hearing before the SPB at which the employer must prove the charges by a preponderance of the evidence and establish that the proven misconduct constitutes cause for discipline under the relevant statutes. (*Skelly*, *supra*, 15 Cal.3d at pp. 202-204 & fn. 19.)

The SPB is a statewide administrative agency created by the California Constitution and vested with quasi-judicial powers for the purpose of reviewing punitive action taken against state employees. (*Skelly*, *supra*, 15 Cal.3d at p. 201; *Fisher v. State Personnel Bd.* (2018) 25 Cal.App.5th 1, 13.) The SPB's ALJ presides over the hearing as the fact finder and adjudicator and issues a proposed decision which the SPB may adopt, modify or reject. (*Skelly*, at p. 204.) If the SPB renders an adverse decision, the employee may seek review of that decision in the superior court by means of a petition for writ of administrative mandamus. (Code Civ. Proc., § 1094.5.)

Trial and appellate courts review petitions for administrative mandamus under the same standards. The question we must answer is whether the agency has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion by the agency. (Code Civ. Proc., § 1094.5, subd. (b); *City of Hesperia v. Lake Arrowhead Community Services Dist.* (2019) 37 Cal.App.5th 734, 748.) Abuse of discretion "is established if the respondent [agency] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5,

13

subd. (b).) Factual findings are reviewed under the substantial evidence standard and purely legal questions like whether the appellant was given sufficient notice are reviewed de novo. (*Department of Corrections & Rehabilitation v. State Personnel Bd.* (2016) 247 Cal.App.4th 700, 707; *Conlan v. Bonta* (2002) 102 Cal.App.4th 745, 753.)

B. *Lack of Notice*

*Brown* is instructive to our analysis of whether Rodgers received sufficient notice of the charges against him and the penalty that could be imposed as a result. In that case, a state university served a professor with a notice of dismissal alleging he had engaged in a "pattern" of misconduct by retaliating against women who had refused his sexual advances. (*Brown*, *supra*, 166 Cal.App.3d at p. 1155.) After an evidentiary hearing, the SPB found only three of the five alleged incidents of sexual misconduct substantiated but nevertheless imposed the full discipline of termination. (*Ibid.*) On appeal, the court dismissed two of the three substantiated incidents based on laches and concluded the remaining incident—while involving a sexual advance—did not involve retaliatory behavior. (*Id.* at p. 1163.)

Left with a single finding significantly less egregious than the university had alleged, the court concluded the professor was not on notice that the sole substantiated allegation could support the full proposed penalty of dismissal. Whereas "the charging document . . . alleged a *linked set of events as the singular ground constituting the cause for discipline*," the record revealed "the finding of a single sexual advance . . . made without threat or retaliation." (*Brown*, *supra*, 166 Cal.App.3d at p. 1163, italics added.)

14

Although the professor had been put on notice that "the events which constitute the remaining finding were *in issue*," their "significance as a *singular ground* of discipline was not charged or communicated to him." Had he been so informed, the court concluded, it "might have entirely altered the cast of [his] case." (*Id.* at p. 1164, fn. 5, italics added.)

Rodgers's penalty suffers the same infirmity as the penalty in *Brown*. The facts the ALJ found true at the hearing are significantly different from those CDCR alleged in their charging document as the basis for the penalty. The NOAA alleged that Rodgers had attempted to cover up his own intentional neglect by ordering subordinates to falsify official documents and then had gotten angry with his subordinates for *reporting that misconduct*. Such behavior on the part of a supervisor represents a serious transgression, one that, if found true, would undoubtedly have supported a severe punishment like the salary reduction proposed in the NOAA. However, the ALJ found all three of those charges unsubstantiated and instead found true a very different version of events.

In that version, Rodgers, while busy performing other duties, repeatedly assured his subordinates he would perform the required inspection, but at a later time. A few hours after having performed the required inspection in a timely manner, Rodgers's supervisor informed him that his subordinates had told another sergeant he was refusing to do the inspection on time. Crucially, the ALJ found Rodgers was confronting the officers for making what—in his mind—was a *false* accusation against him; he was not confronting the officers for *accurately* reporting his own misconduct.

15

CDCR argues we should uphold the SPB's decision because in imposing the full proposed penalty the ALJ considered the proper factors, as articulated in *Skelly*. Specifically, CDCR points to the fact the ALJ concluded that Rodgers's discourteous treatment of the officers was likely to recur and "might well have a chilling effect on them and their willingness to report any misconduct they observe in the future." According to CDCR, we should not substitute our view of the appropriate penalty for the ALJ's.

This argument misses the threshold point. "Disciplinary action cannot be founded upon a charge not made" (*Wheeler v. State Bd. of Forestry* (1983) 144 Cal.App.3d 522, 527), and neither section 19575.5 nor any other provision of law permits CDCR to amend the charging document after they have taken their disciplinary action. (See *Brown*, *supra*, 166 Cal.App.3d at p. 1164, fn. 4 [noting that section 19575.5 authorizes "amendment of the charging document only prior to the submission of the appeal for decision by the board"].) In other words, if an employee did not receive notice that the proposed penalty could be imposed *based on the facts that were found true* after the evidentiary hearing, then the *Skelly* factors do not even come into play. (See *Barber v. State Personnel Bd.* (2019) 35 Cal.App.5th 500, 505-506 [because "the notice of adverse action did not provide Barber with sufficient notice of the workplace rules he allegedly violated *or the specific manner in which the violation occurred* . . . 'he was deprived of his due process right to prepare an effective defense against the charge and to argue the appropriate punishment'"] italics added.)

16

During oral argument, CDCR asserted Rodgers *did* have notice he could be subjected to the full penalty based on the ALJ's findings because the charge of discourteous treatment was listed as one of the grounds for the penalty in the NOAA. In support, CDCR cited the following allegations in the NOAA: "Your confrontation of Officers Angulo and Palafox regarding their reporting of your *failure to perform the requisite inspections* was discourteous and disrespectful towards employees you were tasked with the duty of supervising. Rather than acknowledge *your neglect* of your duty to inspect the CSW inmate restraints at the beginning of the First Watch shift, you verbally confronted and intimidated Officers Angulo and Palafox and used profanity in demanding to know who had contacted Sgt. Moore after you had been advised that the inspections were to take place at the beginning of the shift."

Contrary to CDCR's contention, those allegations do not solve the due process problem, they underscore it. This is because the problem is not with the *charge* of discourteous treatment, it's with the alleged *basis* for that charge. As those allegations make clear, the charge was premised on an underlying *neglect of duty*: CDCR claimed Rodgers angrily confronted his subordinates for accurately reporting his refusal to perform the beginning-of-shift inspection. But that is not what the ALJ found. Instead, the ALJ found that, having *properly discharged his duty*, Rodgers angrily confronted his subordinates because he honestly believed they'd wrongly accused him of shirking his duties.

17

To be clear, we aren't condoning Rodgers' behavior or saying it's not punishable. As the ALJ observed, Rodger's decision to confront his subordinates with anger and profanity was unprofessional, discourteous, and violated CDCR's policy on treating other employees with respect. But the issue before us is not whether he committed *any* misconduct, it's whether he was on notice that his alleged actions could subject him to the proposed penalty. To answer that question, due process requires us to compare the facts alleged to those found true after an evidentiary hearing. In the alleged version, Rodgers engaged in grave misconduct, contributing to a culture of silence that fosters corruption. The ALJ rejected that theory, however, and found he'd simply failed to keep his temper in check and treat his subordinates with respect when confronting them over a misunderstanding. Given the significant difference between the two kinds of misconduct, we conclude Rodgers lacked notice that his actions could subject him to the imposed penalty.

Our conclusion makes it unnecessary to address Rodgers's contention that the ALJ's finding he used profanity when confronting the officers is not supported by substantial evidence.

## III

## DISPOSITION

We reverse the judgment and direct the trial court to issue a peremptory writ of mandate directing the SPB to set aside its decision sustaining CDCR's disciplinary action

18

against Rodgers and to accord him any other relief to which he is entitled. Rodgers shall recover his costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)

CERTIFIED FOR PUBLICATION

SLOUGH
J.

We concur:

RAMIREZ
P. J.

CODRINGTON
J.